(A. R. D. 56)

INTERNATIONAL FORWARDING CO., INC., ET AL. *v.* UNITED STATES

Entry No. 747214, etc.

## Second Division, Appellate Term

(Decided February 18, 1955)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellants.
*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for review of a decision and judgment (Reap. Dec. 8281) holding and decreeing that the proper basis of value of certain leather sandals or huaraches imported from Mexico is, in the case of each of the appeals herein involved, foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, and that such value is, in each instance, the appraised value. The theory upon which this conclusion was predicated by the single judge sitting in reappraisement was that "the record fails to reveal any evidence which would warrant a finding that the plaintiffs overcame the presumption of correctness attaching to the value returned by the appraiser * * *."

Seven appeals for reappraisement, covering merchandise exported from Mexico, which were consolidated for the purposes of trial, are included in this proceeding. The pertinent details concerning these appeals are as follows:

| Entry | Appeal | Merchandise | Entered value | Claimed value | Appraised value |
|-------|--------|-------------|---------------|---------------|-----------------|
| 759028 | 154793–A | Wos. Natural 400T, 700, 900, 700W, | 3. 40  Y | 3. 40  Y | 3. 75  X |
|  |  | Men's 300X | 3. 60  Y | 3. 60  Y | 4. 25  X |
| 747214 | 154769–A | 700 | 3. 95  Y | 3. 95  Y | 4. 25  X· |
| 719644 | 154770–A | Wos. Oaxaca | 3. 95  Y | 3. 95  Y | 4. 25  X |
| 723244 | 156208–A | "      " | 4. 25  Y | 4. 10  Y | 5. 60  X |
| 723568 | 156207–A | "      " | 4. 25  Y | 4. 10  Y | 5. 60  X |
| 723616 | 156206–A | "      " | 4. 35  Y | 4. 40  Y | 5. 60  X |
| 724810 | 156205–A | "      " | 5. 50  Y | 5. 50  Y | 5. 60  X |

Values are stated in terms of Mexican pesos
X—Plus 8.80 pesos per 1,000, plus packing
Y—Including all charges and packing

At the trial, appellants offered in evidence, as plaintiffs' collective exhibits 1 through 7, respectively, the invoice, entry, and where filed, amended entry, and summary sheet, for each of the involved appeals, and, as plaintiffs' collective exhibit 8, an affidavit of Jose Palacios Norman, owner of the concerns trading as El Arte Tonalteca (Tonaltecan Art) and as the Guadalajara Shoe Co., the exporters of the instant merchandise. In addition, one witness testified on behalf of plaintiffs. For appellee, there are in evidence as defendant's collective exhibits A and B, exhibit D, and collective exhibit E, respectively, reports of Treasury Representative D. J. De Lagrave. Certain portions of various of said exhibits were excluded from evidence or limited in application by the trial judge. In view, however, of the position taken by us, as will be revealed, *infra*, specific reference thereto is deemed unnecessary.

It appears from the record that appraisement of the involved huaraches was predicated upon the foreign value or export value of similar merchandise, it being the position of the Government that there was neither foreign nor export value of such merchandise, and that foreign value and export value of similar merchandise were the same. Insofar as foreign value of such merchandise is concerned, the facts establish without question that it was neither sold nor offered for sale for home consumption, in Mexico, during the period covered by the importations at bar.

Appellee's contention concerning the absence of export value for such merchandise rests upon the alleged existence of an exclusive sales agreement between the exporter and the ultimate consignee (Wales Import Co., Inc.). Appellants, however, contend that no such agree-

ment was at any time here pertinent, in effect, and that, therefore, export value of such merchandise is both ascertainable and controlling.

The trial court, noting the provisions of section 402 (a) (1), (c) and (d) of the Tariff Act of 1930, as amended,[1] quite properly observed that:

> * * * Assuming, without deciding, that there was an export value for "such" merchandise and a foreign value for "similar" merchandise, the higher of the two must be accepted as the value of the merchandise * * *.

Implicit in the appraiser's presumptively correct return of value, in view of Government counsel's statement at the trial, is the finding, among others, that similar merchandise was freely offered for sale for domestic consumption in Mexico, in the usual wholesale quantities and in the ordinary course of trade. The burden rests upon the party challenging the correctness of an appraisement to show the error in the appraiser's finding and to establish, affirmatively, what is the true value. In discharge of that burden, the challenging party is required to meet every material issue in the case. *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495; *United States* v. *Gane & Ingram, Inc.*, 24 C. C. P. A. (Customs) 1, T. D. 48264; *United States* v. *T. D. Downing Co. (Geo. H. Sweetnam, Inc.)*, 20 C. C. P. A. (Customs) 251, T. D. 46057. Hence, it was incumbent upon appellants here to prove either that the foreign value of similar merchandise was not higher than export value of such or similar merchandise, or, alternatively, that there was no foreign value for similar merchandise. Until either of these propositions is established, any inquiry into the issue of whether or not an exclusive sales agreement had been negotiated between the parties remains irrelevant.

All of appellants' evidence bearing upon the subject of the foreign market is to be found in paragraphs 3 and 4 of plaintiffs' collective exhibit 8, which, as heretofore noted, is the affidavit of Jose Palacios

---

[1] The cited portions of section 402, Tariff Act of 1930, as amended, provide as follows.

SEC. 402. VALUE.

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

    (1) The foreign value or the export value, whichever is higher;

\* \* \* \* \* \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Norman, the owner of the two firms which exported all of the leather sandals with which we are here concerned. These paragraphs read as follows:

3. That during the period from January 1941 through May 1943 I did not sell or offer for sale (under my own name, or that of El Arte Tonalteca, or that of the Guadalajara Shoe Company, or any other way) domestically in Mexico any of the same types or kinds of huaraches that I sold or offered for sale to the Wales Import Company, Inc. of 251 Fifth Avenue, New York. From my experience in following the Mexican huarache market and from contact with other wholesale producers and sellers, I am informed, and verily believe it to be true, that such and similar huaraches (as I sold to Wales Import) were not generally sold at wholesale domestically in Mexico by any other Mexican concerns. In any event, I am informed that any such domestic sales occurred only when Mexican wholesale exporters bought at lower prices (lower than the wholesale export prices) from other Mexican wholesalers to fill out a large export order, or only when Mexican retail outlets bought for the tourist trade similar merchandise at the prevailing wholesale export prices, which at no time were higher than the export prices for the usual wholesale quantities.

4. That during the period from January 1941 through May 1943, there was no specific wholesale quantity for Mexican huaraches sold for export to the United States or for domestic consumption. From my familiarity with the business done by other competitor concerns and with those with which I have been connected, I personally know as a fact that the usual wholesale quantities have been, and are, at least 1,000 pairs of huaraches, and that the wholesale selling price of Mexican huaraches has been, and is, the same for sales of 1,000 pairs or more. In the trade in Mexico there were, and are, no quantity discounts for unusually large sales of handmade things. Mexican huaraches must be woven or laced by hand; the number of hand workers is limited, and therefore the wholesale prices are the same for very large quantities as compared to a small wholesale quantity of about 1,000 pairs. The manufacturers or producers sell or offer for sale only those quantities which they have been able to produce or obtain in a market confined by a limited number of workers.

Commenting upon the statements contained in paragraph 3, *supra*, the trial court observed:

It is apparent that the statements above quoted are not clear as to how much of the affiant's knowledge was based upon personal experience and how much was imparted to him by the statements of others. A serious question exists as to whether the statements are on their face shown to be based upon hearsay, and, indeed, objection on that ground to the admission of the statements was made at the time of trial by counsel for the Government.

The question of the admissibility of the statements becomes academic, however, in view of the fact that examination of other evidence offered by the plaintiffs reveals contradictory statements made previously by the affiant.

The so-called contradictory statements to which the trial court alluded are the affirmative answers to the question "Is such or similar merchandise offered or sold in the home market for home consumption" appearing on the invoices, which are parts of plaintiffs' collective exhibits 2, 3, 4, 5, and 6, respectively, under the signature of the affiant.

We are not inclined to the view that these invoice statements and the quoted portions of the affidavit are in conflict, especially since, in the latter document, Norman specifically recites the circumstances under which domestic sales in Mexico in fact occurred. To say that "such and similar huaraches * * * were not *generally* sold at wholesale domestically in Mexico by any other Mexican concerns," [italics supplied] is not, in our opinion, equivalent to a denial of the fact that such sales were indeed made.

Were we, nevertheless, to agree with the trial court's finding of inconsistency, we doubt that we should for that reason alone reject the statements made in the affidavit. Although the invoices in question are signed by the individual who executed the affidavit, and contain his declaration that all statements appearing therein are true and correct, an invoice is an unverified document. The presumption of its veracity can never be as strong as that which attaches to a statement subscribed under oath and, hence, surrounded by greater safeguards against misrepresentation or lack of credibility. *H. A. Caesar & Co.* v. *United States*, 72 Treas. Dec. 1074, Reap. Dec. 4119; *Union Brokerage Co.* v. *United States*, 72 Treas. Dec. 1213, Reap. Dec. 4188, affirmed in *United States* v. *Union Brokerage Co.*, 73 Treas. Dec. 1556, Reap. Dec. 4312.

Assuming, however, that affiant's report of market conditions in Mexico is truthful in every respect, and not to be rejected on the grounds of credibility alone, is it legally sufficient to establish, *prima facie*, that the values returned by the appraiser are erroneous; that there were no foreign values for similar merchandise; or, if there were, that such values were equal to, or less than export values? We think not. The quoted paragraphs bearing on this matter are replete with conclusions unsupported by evidentiary facts from which such conclusions derive. According to affiant, the prices at which Mexican retail outfits bought similar merchandise were no higher than the export prices for the usual wholesale quantities. What these usual wholesale quantities are, is not established by competent evidence. The mere statement that the usual wholesale quantities are at least 1,000 pairs of huaraches is but a paraphrase of the statutory language which here controls. There is no proof which enables the court to determine whether the recited conclusion is legally justified. *Brooks Paper Company* v. *United States, supra*; *Semon Bache* v. *United States*, 28 C. C. P. A. (Customs) 166, C. A. D. 140; *Hashimoto* v. *United States*, 69 Treas. Dec. 1431, Reap. Dec. 3818.

Moreover, there is no evidence anywhere in the record to show that the so-called export prices to which affiant refers, and with which affiant compares domestic prices, represent export value, as that value is defined in section 402 (d), *supra*.

For the reasons here assigned, we affirm the conclusion of the trial court that the evidence is insufficient to overcome the presumption of correctness attaching to the values returned by the appraiser. Accordingly, we find as facts that—

(1) The merchandise involved herein consists of leather sandals or huaraches exported from Mexico.

(2) At the times of exportation of said merchandise to the United States, such merchandise was not freely offered for sale for home consumption in Mexico.

(3) There is no evidence to establish that at said times merchandise similar thereto was not freely offered for sale for home consumption to all purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, or that, if so offered, the price thereof was not higher than the price at which such or similar merchandise was freely offered for sale for exportation to the United States.

(4) That the appraiser's finding of values, which is presumptively correct, has not been overcome.

We conclude therefore that—

(1) The proper basis for the determination of the value of the merchandise herein involved is foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended.

(2) Such value in each instance is the appraised value.

(3) The judgment of the trial court should be affirmed.