(Reap. Dec. 8794)

SWIZZELS, INC. *v.* UNITED STATES

Entry No. 752324.

(Decided May 1, 1957)

*Brooks & Brooks* (*Thomas J. McKenna* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the defendant.

JOHNSON, Judge: This is an appeal for reappraisement of merchandise described on the invoice as "Swizzels Lucky 7's Candy Balls," imported from England on or about October 8, 1950. It was invoiced and entered at a value of £0.1.8⅙ per box of 80 packets and was appraised at United States $0.3798 per box of 80 packets, net packed.

It was stipulated at the trial that there was no foreign or export value for such or similar merchandise and that there was no United States value for similar merchandise. It was further stipulated that if the court finds United States value for such merchandise to be the proper basis of dutiable value, then the appraised value represents such United States value, and that if the court finds that the cost of production is the proper basis of dutiable value, the cost of production is 20.125 pence per box, provided drawback, amounting to 11 shillings, 8 pence per hundredweight, received by the English shipper upon exportation, is held not to be a part of the dutiable value; otherwise the cost of production amounts to 21.965 pence per box.

There was received in evidence as plaintiff's exhibit 1 an affidavit of David Dee, director of Swizzels, Ltd., manufacturer of the imported merchandise. The affiant states:

(C) The records kept under his supervision disclose the following cost and profit figures for LUCKY 7's CANDY BALLS per ton during the period October 1949 to December 1952.

| SUMMARY | COST PER TON (1,400 boxes) | COST PER BOX | |
|---|---|---|---|
| Goods | £48. 11. 8 | 8. 328 | pence |
| Labour—Granulating =£7. 6. 0 Tabletting =£3. 1. 6 Wrapping =£6. 2. 6 | 16. 10. 0 | 2. 828 | " |
| Expenses—50% on labour | . 8. 5. 0 | 1. 415 | " |
| Wrappings | 33. 19. 6¾ | 5. 825 | " |
| Profit | 10. 1. 8¼ | 1. 729 | " |
| | £117. 7. 11 | 20. 125 | " |

Milton Chanin, president of Swizzels, Inc., of Hoboken, N. J., manufacturer, importer, and distributor of confectionery products, testified as follows: The merchandise herein consisted of candy balls, packed in boxes, containing 80 rolls of 7 balls each. Forty boxes made up a case. His company employed candy brokers on a commission basis to solicit orders for the merchandise. They were instructed to limit their sales to candy jobbers, and the price at which they could make offers was fixed at 50 cents per box of 80 rolls. The minimum quantity that could be purchased was 120 boxes (3 cases), and the candy jobber had to agree to sell only to those retailers who would honor the price of 1 cent per roll, which was fixed by Swizzels, Inc.

Printed matter and circulars were mailed out to candy jobbers by Swizzels, Inc., samples of which were received in evidence at the trial (plaintiff's collective illustrative exhibits 3 and 4). One of these refers to Lucky 7's particularly and indicates that the rolls are to be sold at retail at 1 cent each. It also states:

All items are packed 80 count to the box, 40 boxes to the carton. Minimum shipment is 3 cartons.

Priced at Only 50¢ per box
Full freight allowed

The other exhibits refer to Swizzels 1-cent candies generally, giving the price as 50 cents per box, and the minimum shipment as three cases.

On cross-examination, Mr. Chanin stated that the candy brokers were requested to limit their sales to confectionery jobbers and that they did so in most instances. His firm sold to drugstores and theaters on occasion, but the items sold to such outlets were not imported merchandise. He said that he personally checked the selling prices of hundreds of retail firms and found that they never deviated from the 1-cent price.

He stated that a customs agent consulted him on at least two occasions and that he showed him his books and records. He testified:

X Q. Do you recall you exhibited records showing that you sold Lucky 7 Candy Balls in April, June 1949, July 1949, December 1950? To others than brokers?—A. That may be, sir, as I explained before, these sales were isolated cases and not encouraged.

X Q. Did you also sell to retail drug stores in 1949, 1950 and 1951?—A. Occasionally.

X Q. Did you also sell to theatres in 1950 or 1951?—A. Occasionally, sir.

X Q. And your records reflected that, did they not?—A. I should like to point out that these items were items that were manufactured in the United States.

X Q. Of the Lucky 7s?—A. We manufactured Lucky 7s in the United States also. We were making the same item here as we were importing.

The witness explained that he was permitted to manufacture Lucky 7's under a verbal agreement with the English company. He did not recall when his firm started to manufacture them, but believed it must have been in late 1949 or early 1950.

The witness stated further that, at the time of the special agent's visits, both the imported goods and his own manufactures were mentioned and that the conversation "was quite mixed up, as to both operations."

Two reports of Customs Agent J. W. Sutcliffe were received in evidence (defendant's exhibit A and collective exhibit B). According to the first of these, investigation was made at the Hoboken office of Swizzels, Inc., interviews with Mr. Chanin were conducted, and the records examined. The report states further that Swizzels, Inc., is the only American buyer of the merchandise and that all of it has been sold solely to candy jobbers at 50 cents per box, and a 5 per centum commission has been paid. Jobbers sell only to small retailers.

In a subsequent report, the customs agent states:

In the report of May 23, 1951 on this subject, page 2, last paragraph, it is stated that the merchandise has been sold solely to candy jobbers. Mr. Milton Chanin, president of the corporation, has now said that the goods were sold freely to jobbers, department stores, drug chains, supermarkets, grocery stores, theatres, etc.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The correspondence to salesmen throughout the country shown to the writer at the Hoboken, N. J., office of Swizzels, Inc., suggests that sales be secured from any and all possible types of candy distributors and always at the price of 50 cents per box of 80 rolls. \* \* \*

Attached is a photostatic copy of sheets, showing sales to other than candy jobbers. These list, as to Lucky 7's, 1 sale to a theater in 1951 and 1 in 1950; 1 sale to a drugstore in 1951, 1 to a variety store in 1950; 1 to a soda and beer jobber in 1951; and 3 to exporters in 1950 and 1 in 1951. Except for 2 sales to exporters, the quantities

were 1 or 2 cases. The other sales listed on the sheets cover items of merchandise not involved in this case.

Plaintiff contends that there is no United States value for this merchandise, because all sales thereof in this country were subject to restrictions. According to plaintiff's witness, the price and the minimum quantity that could be purchased were fixed, and the merchandise was sold only to candy jobbers, who were required to sell only to retailers, who would agree to maintain the price of 1 cent a roll, fixed by plaintiff for sales to consumers. Sales to others than candy jobbers were made occasionally but were not encouraged. Mr. Chanin stated that they did not involve the imported merchandise but other candy made by his firm in this country. The only evidence that offers were made to all purchasers is found in the second report of Customs Agent Sutcliffe, quoted above. Although defendant claims that the statements therein are supported by the lists of sales attached to the report, actually only occasional sales of Lucky 7's in small quantities are shown. The lists tend rather to support Mr. Chanin's testimony that sales of Lucky 7's to other than candy jobbers were not encouraged.

Insofar as there is a conflict between the testimony of Mr. Chanin and the report of Customs Agent Sutcliffe, the former's statement in open court, under oath and subject to cross-examination, is entitled to greater weight than the unverified report of the customs agent. *United States* v. *William Shaland*, 30 Cust. Ct. 575, A. R. D. 12; *International Forwarding Co., Inc.* v. *United States*, 34 Cust. Ct. 540, A. R. D. 56.

Under the statute (section 402 (e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938), United States value is the price at which such or similar merchandise is freely offered for sale in the principal market of the United States, to all purchasers, in the usual wholesale quantities and in the ordinary course of trade. It is well settled that, whenever a restraint is imposed upon the resale, use, or other disposition of purchased goods, there can be no free market. *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, C. A. D. 262. Where prices for resale are fixed by the original sellers, a restricted market is created, and the merchandise is not freely offered to all purchasers within the meaning of the statute. *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. (Customs) 33, C. A. D. 341; *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158; *United States* v. *L. Bamberger & Co.*, 28 Cust. Ct. 542, Reap. Dec. 8081; *J. L. Hammett Company* v. *United States*, 22 Cust. Ct. 454, Reap. Dec. 7702.

The record herein establishes that this merchandise, Lucky 7's candy balls, was not offered for sale to all purchasers, but was pri-

marily offered to jobbers and only occasionally to others; that the price and the minimum quantity that could be purchased were fixed; that the jobbers were restricted to reselling only to retailers, who would sell to consumers at the price of 1 cent per roll, which price was fixed by the importer. Therefore, the market was a controlled one and no United States value can be found.

It has been agreed that the cost of production is either 20.125 pence per box or 21.965 pence per box, depending upon whether drawback of 1.84 pence per box is to be included in the cost of the materials. Section 402 (f) of the Tariff Act of 1930 provides that the cost of production shall include—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

The affidavit of David Dee (plaintiff's exhibit 1) states that, according to the manufacturer's records, the cost of the goods was 8.328 pence per box [which did not include the amount of the drawback]. At the trial, it was agreed by counsel that the cost of production was 20.125 pence per box "provided the drawback amounting to eleven shillings, eight pence per hundredweight received by the English shipper upon exportation" is not a part of dutiable value. The record does not establish from whom the manufacturer obtained the materials nor what was actually paid for them. Apparently, the price included the amount of drawback, but said amount was refunded upon exportation of the completed article.

In support of its claim that the drawback is not part of the cost of the materials, plaintiff relies upon *United States* v. *European Trading Co.*, 27 C. C. P. A. (Customs) 289, C. A. D. 103. It was held in that case that, in assessing special dumping duties on fish trap netting, a so-called export rebate should not be included in the cost of production as part of the cost of wire rods used in making the imported article. The court found that there was no evidence that the exporter received the rebate *upon* exportation or that the refund was payable *after* proof of exportation of the completed article. It held further that there was substantial evidence to support the finding of the trial court that the manufacturer of the wire netting actually paid for the wire rods an amount which did not include the so-called export rebate.

In the instant case, drawback was received *upon* exportation, so that the original cost of the material must have included the amount thereof.

Under the statute, the cost of production includes the cost of materials at a time which would ordinarily permit the manufacture of the particular merchandise under consideration in the usual course of business. In a case just decided by our court of appeals, *Charles*

*Stockheimer* and *Inter-Maritime Forwarding Co., Inc.* v. *United States,* 44 C. C. P. A. (Customs) 92, C. A. D. 642, suits 4878/4879, decided March 29, 1957, it was held that the language of the statute fixes the cost of materials with respect to a definite time, that is, the latest time which would permit delivery of the materials on the date when manufacture of the merchandise was commenced. The court said that, if the producer had actually made a purchase at the time specified, the price paid would fix the statutory cost of materials and that, if he had not, the cost would be the price for which he might have made a purchase at such time.

It follows that, since the cost of materials is determined as of a specified time, which is at or prior to the date of manufacture of the merchandise, refunds which may be received thereafter, if the merchandise is exported, may not be deducted.

See also *Adolph Goldmark & Sons Corp.* v. *United States,* 31 C. C. P. A. (Customs) 6, C. A. D. 241, which involved the determination of the component material of chief value of marmalade, manufactured from sugar and oranges. It was held that a drawback of duty on sugar, received upon exportation of the marmalade, could not be considered in computing the component material of chief value, since the refund became effective after the marmalade was manufactured.

Likewise, the drawback herein, having been received after the candy was manufactured, may not be considered in determining the cost of the materials used to produce the candy.

On the record presented, I find as facts:

1. That the merchandise involved herein consists of "Swizzels Lucky 7's Candy Balls," imported from England on or about October 8, 1950.

2. That such and similar merchandise was not freely offered for sale to all purchasers in England for home consumption or for export to the United States.

3. That such and similar merchandise was not freely offered for sale to all purchasers in the ordinary course of trade in the United States.

4. That the cost of production of said merchandise was as follows:

| | |
|---|---|
| Materials | 8. 328 pence per box (plus drawback) |
| Labor | 2. 828 pence per box |
| Usual general expenses | 1. 415 pence per box |
| Wrappings | 5. 825 pence per box |
| Profit | 1. 729 pence per box |
| | 20. 125 pence per box |

5. That drawback, amounting to 1.84 pence per box, was received by the English shipper upon exportation of the completed merchandise.

I conclude as matters of law:

1. That there was no foreign, export, or United States values, as said values are respectively defined in section 402 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, for said merchandise.

2. That cost of production, as that value is defined in section 402 (f) of said tariff act, is the proper basis for the determination of the value of the merchandise involved herein.

3. That, in determining said cost of production, drawback, amounting to 1.84 pence per box, received by the English shipper upon exportation of the completed merchandise, may not be deducted from the cost of materials thereof.

4. That the cost of production of the within merchandise was 21.965 pence per box.

Judgment will be rendered accordingly.