(A.R.D. 124)

UNITED STATES *v.* FORD MOTOR COMPANY

Entry No. 967835.

Third Division, Appellate Term

(Decided February 8, 1961)

*William H. Orrick, Jr.,* Assistant Attorney General   (*Daniel I. Auster,* trial attorney), for the appellant.

*John A. Moekle* and *James E. O'Boyle* for the appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges; DONLON, J., concurring

JOHNSON, Judge: This is an application for review of a decision and judgment of Judge Lawrence involving automobiles exported by Henry Ford & Son, Ltd., of Cork, Ireland (hereinafter called Ford of Ireland) and imported by Ford Motor Company of Dearborn, Mich., on or about June 19, 1957. *Ford Motor Company* v. *United States,* 44 Cust. Ct. 678, Reap. Dec. 9683.

The merchandise consists of 25 Standard Anglia, 62 Anglia De Luxe, and 50 Prefect automobiles. The component parts thereof had been manufactured or purchased for distribution by Ford Motor Company, Limited, of Dagenham, England (hereinafter called Ford of England), and shipped in knocked-down condition to Ford of Ireland and there assembled into automobiles. Ford of Ireland thereafter sold and shipped the completed cars to the United States.

Upon importation into the United States, the appraiser, in determining value, included an amount representing an Irish import duty which might have been imposed on the component parts had they been used in the manufacture of automobiles for home consumption in Ireland.

By stipulation of the parties, it has been agreed that there is no foreign, export, or United States value for the merchandise, and that the proper basis for determining value is the cost of production, as that value is defined in section 402 (f) of the Tariff Act of 1930. It was also agreed that the cost of production, if held to include the amount of import duty into Ireland, was as follows:

|  | Standard Anglia | Anglia de Luxe | Prefect |
|---|---|---|---|
| Material and labor | £323. 86 | £332. 28 | £348. 38 |
| Usual general expenses | 32. 39 | 33. 23 | 34. 84 |
| Profit | 28. 50 | 29. 24 | 30. 66 |
| Total | £384. 75 | £394. 75 | £413. 88 |

It was further stipulated that, exclusive of Irish duty, the cost of production was as follows:

|  | Standard Anglia | Anglia de Luxe | Prefect |
|---|---|---|---|
| Material and labor | £275. 86 | £282. 28 | £295. 38 |
| Usual general expenses | 27. 59 | 28. 23 | 29. 54 |
| Profit | 24. 27 | 24. 84 | 25. 99 |
| Total | £327. 72 | £335. 35 | £350. 91 |

It is not disputed that Irish duties are applicable generally upon the importation of materials into Ireland for use there, nor is it disputed that no Irish import duties were actually paid on the materials used in the manufacture of the cars involved herein. This was due to the fact that an exemption had been granted to Ford of Ireland under the provisions of section 38 of the Irish Finance Act of 1932, which read as follows:

Whenever the Revenue Commissioners are satisfied that any article or goods chargeable with a duty of customs are imported for the purpose of undergoing in Saorstat Eireann a process of manufacture and being subsequently exported or for the purpose of being incorporated in Saorstat Eireann with other articles or goods as a part or ingredient of a manufactured product which is intended to be exported, the Revenue Commissioners may, subject to compliance with such

conditions as they may think fit to impose, permit such article or goods (as the case may be) to be imported without payment of duty.

At the trial, Timothy M. Courtney, head of the customs department of Ford of Ireland, testified that he had arranged for the importation of the parts for these automobiles from England into Ireland without payment of duty under conditions laid down by the Irish Revenue Commissioners, which conditions included the posting of a bond in the sum of £60,000, the keeping of accounts of all materials and parts imported duty free, and the segregation of all such materials and parts from those used in cars to be sold for home consumption.

Mr. Courtney explained that the merchandise to be used for assembly into automobiles for export was packed in cases specially marked by Ford of England with the letters CUSA (Cork, United States of America), whereas the cases of parts for Irish cars had only the case number. The parts for the vehicles for export were kept completely segregated from other parts all through the course of assembly and exportation. Such parts were under constant surveillance of three resident customs officials because it was their responsibility as well as that of the company to see that none of those parts was used in automobiles to be sold for domestic consumption in Ireland. Such parts were never, in fact, so used.

Michael Mullins, assistant principal officer in the Customs and Excise Secretariat in the Office of the Revenue Commissioners of Ireland, testified that it was not necessary under the Irish Finance Act to demand a bond but that it was the invariable practice of the Commissioners to require one. He stated that no Irish customs duty accrued or was paid or became due or will become due on the parts of the automobiles involved herein because they were duly exported after full compliance by Ford of Ireland with all the conditions laid down by the Commissioners. He added that while it is mandatory on the Commissioners to grant an importer permission to import duty free under section 38, conditions may be set and compliance required. Unless the conditions are met, the arrangement does not take place, duty has to be paid, and the money recovered later by way of drawback. The witness stated that the purpose of the bond is to insure that all the conditions are kept and that duties are paid if the merchandise should not be exported.

Mr. Courtney testified further that vehicles assembled for shipment to the United States are called North American Standard Specification vehicles and are referred to as NASS vehicles. They have left-hand drives, whereas those assembled for sale in Ireland have right-hand drives, which means the following parts are transposed from the right-hand side of the car to the left-hand side: Steering gear and steering

wheel, instrument panel, dash panel, floor pedals, the floor itself, seat tract arrangement, handbrake, speedometer shaft, brake linkages, and lock mechanisms. The witness also stated: The windshield glass for the NASS vehicle is of laminated glass to meet United States legal requirements as compared to toughened glass for the Irish domestic car and the headlamps and flashing signals are such as meet American requirements. The interior trim is two tone rather than one tone; white sidewall tires predominate; the windshield wipers are chrome rather than black; scuff plates, bumper over-riders, and sun visors are supplied for NASS vehicles, but not for Irish cars. Certain items manufactured in Ireland are used in the domestic cars but not in those for export, such as tires, batteries, spark plugs, road springs, seat springs, paint, and glass. The NASS vehicles are assembled in one continuing production run, because the operators have to be on the other side of the car. Due to the fact that there is a major difference in the assembly of vehicles for left-hand drive, key operators had to be sent to Ford of England for intensive training, after which the workmen in Ireland had to be instructed as to the differences in assembly technique. Automobiles assembled for export to the United States could not be economically converted in Ireland for the Irish domestic market.

Carl F. Levy, regional finance manager of the European manufacturing companies, Ford International Division, testified that he was familiar with the specifications for automobiles exported by Ford of Ireland to the United States and with those for automobiles manufactured for home consumption in Ireland, although he had never seen a vehicle which was manufactured for the Irish market. He stated that laminated windshields must be used in all automobiles that are used in the United States, because of the vehicle codes in the various States, whereas windshields to be used in Ireland are made of toughened glass, and that other differences, due to United States requirements, include sealed beam headlamps, turn signals, color of direction signal indicators, and high beam indicators.

In his opinion, Irish domestic units are not commercially interchangeable in the United States with units made for export to the United States. He said that a unit built for the Irish domestic market could not be sold or operated in the United States because of legal restrictions, and because people are not going to buy a right-hand drive in the United States if they have a choice of a left-hand drive at a comparable price.

The Government offered in evidence a report of Treasury Representative William P. Hunton, dated June 3, 1957 (defendant's collective exhibit A), and a report of Senior Customs Representative

Charles R. Howard, dated September 3, 1959 (defendant's collective exhibit B). These papers contain cost price breakdowns, but since cost of production figures have been agreed upon by counsel, the details of these papers need not be recited here.

Section 402(f) of the Tariff Act of 1930 defines cost of production, which has been stipulated to be the proper basis of valuation here, as follows:

(f)   COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1)   The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2)   The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3)   The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4)   An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

It is appellant's position that, although no Irish import duty was paid or accrued on the materials used in the manufacture of the imported merchandise, an amount representing such duty was properly added to the cost of production by the appraiser, on the ground that Irish import duty was payable on the importation into Ireland of such or similar materials used in the manufacture of automobiles for home consumption, which automobiles are claimed to be similar. Appellee contends that the automobiles in question are not similar to the Irish cars; that even if they are, the cost of production of "such" automobiles, which did not include the Irish duty, is controlling; and that the position of appellant is in violation of the United States Treaty of Friendship, Commerce, and Navigation with Ireland (1 UST 785; TIAS 2155). The court below held that the imported automobiles are not similar to those manufactured for home consumption and that Irish import duties are not properly part of the statutory cost of production thereof.

We are in accord with the trial court that the evidence presented establishes that the NASS vehicles are not similar to the cars produced

for home consumption in Ireland. Not only do the NASS vehicles have a left-hand drive and the Irish cars a right-hand drive with all the attendant differences in construction, but they are made to meet special American requirements as to windshield glass, headlights, direction signals, and high beam indicators. In addition, they have some equipment which is not supplied to Irish automobiles at all. One could not be economically converted into the other, nor are they commercially interchangeable.

As was stated by the trial court, it is well settled that, as a general rule, "commercial interchangeability" is one of the essential features of similarity. In *United States* v. *Henry Maier*, 21 C.C.P.A. (Customs) 41, T.D. 46378, the court set out the rule as follows (p. 51):

> It is apparent, therefore, that for different manufactures of velvets in the gray to be "such or similar" within the meaning of paragraph 2 of said section 402(e) [Tariff Act of 1922], it is not enough that they be of the same general character, but they must be made of approximately the same materials, commercially interchangeable, and adapted to the same uses and so used, * * *.

Here, while the NASS vehicles may be made of some of the same materials as the cars for Irish consumption, they are not commercially interchangeable, nor, because of different rules of the road and other legal requirements, are they adapted to the same use.

Furthermore, in our opinion, similarity of the NASS vehicles and those produced for Irish home consumption is not decisive of the issue before us.

Section 402(f), *supra*, defines cost of production as including the cost of materials and fabrication employed in manufacturing or producing *such or similar* merchandise. Other subdivisions of section 402, defining foreign value, export value, and United States value, also refer to *such or similar* merchandise. Under these subdivisions, it has been held that these words have not been used synonymously, but alternately; that "such" merchandise means identical merchandise; and that if a particular value can be found for "such" merchandise, said value for "similar" merchandise is removed from consideration. *United States* v. *Meadows Wye & Co., Inc. (F. A. MacCluer, Inc.)*, 15 Ct. Cust. Appls. 451, T.D. 42643; *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714; *United States* v. *Antique Import Co.*, 40 Cust. Ct. 868, A.R.D. 83; *Luria Steel & Trading Corp. et al.* v. *United States*, 42 Cust. Ct. 480, Reap. Dec. 9311; *United States* v. *J. J. Gavin & Co., Inc. (Soeldner-Hyman Co.)*, 24 Cust. Ct. 576, Reap. Dec. 7808; *Prudential Lumber Corp. et al.* v. *United States*, 69 Treas. Dec. 1505, Reap. Dec. 3850; *Frank P. Dow Co., Inc.* v. *United States*, 32 Cust. Ct. 547, Reap. Dec. 8276.

The same construction is applicable to the terms "such or similar" in section 402(f), *supra*. Therefore, before reaching the question of

similarity, it must be determined whether a cost of production has been established for *such* merchandise, including the cost of materials and fabrication employed in manufacturing *such* merchandise, the NASS vehicles. This cost is known. In fact, appellant states in its brief:

> * * * The material and labor costs of the Irish home consumption model were not used. The stipulation refers to materials and labor in making *these* automobiles and not those used in Ireland for home consumption. The costs of materials and labor are agreed to be £275.86. The appraiser added the agreed upon Irish import duty of £48, making a total of £323.86 for the Standard Anglia model. Similar calculations effect [*sic*] the other two models. [Emphasis· quoted.]

What the appraiser has done, therefore, is to add to the actual costs of the material and labor in making these automobiles an amount representing an Irish duty which might have been imposed if the parts were to be used in vehicles for Irish consumption. In other words, the imported merchandise was not appraised on the basis of the cost of production of automobiles for home consumption, whether similar or not, or the cost of materials used therein, whether similar or not, but on the basis of the actual costs of production of these automobiles, including the cost of materials used therein, plus an amount representing Irish duty. Thus, the issue is whether or not such amount may be added in determining cost of production of *such* automobiles.

Section 402 (f) (1), *supra*, defines cost of materials as such cost "at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business." This language was construed in *Charles Stockheimer et al.* v. *United States*, 44 C.C.P.A. (Customs) 92, C.A.D. 642, wherein the court held (pp. 94–95):

> No doubt if the producer had actually made a purchase of materials at the time specified by the section, the price paid for it would fix the statutory cost of materials. If he did not do so however, and that is the case here, it becomes necessary to choose between the price actually paid by the producer for his last purchase *prior* to the specified time, and the price for which he might have made a purchase *at* the specified time. We are of the opinion that the second of those alternatives must be selected. [Emphasis quoted.]

In the instant case, there is no evidence that the materials were not purchased at the time specified in the statute. Therefore, the price paid fixes the statutory cost of the materials. That price did not include any amount for Irish duty.

A similar situation was involved in *Wecker & Co.* v. *United States*, 47 Treas. Dec. 825, T.D. 40989. The imported merchandise was manufactured in Germany with the use of material in the gray, imported from England or Czechoslovakia. It was established that when such

material was used for the manufacture of an article which was sold in Germany, there was imposed on the material entering the article a tax, but if the article was not sold in Germany, the tax did not attach. The court held that the tax was not a part of the statutory cost of production of the imported merchandise, stating (p. 830):

> As the statute enumerates the items that are necessary in the cost of production, can a tax, not exacted or paid on the materials entering into the completed article, be levied on the merchandise when the article is not sold for domestic consumption in Germany? There is not any question of bounty involved. Not a single thread entering into the article in dispute has or was ever required to pay an import tax. Every cost entering into the imported article has been ascertained. If the merchandise had a domestic market and the tax was remitted for the reason it was intended for other than domestic ⸺ade a different question would arise. In such instances the tax would be equivalent to a bounty. A bounty can not arise when the material entering into an article neither pays a tax nor has a domestic market. *To add a tax under such circumstances, neither collected nor remitted, is to add to cost of production something not contemplated by the law of appraisement by that method.* [Emphasis supplied.]

*United States* v. *European Trading Co.*, 27 C.C.P.A. (Customs) 289, C.A.D. 103, involved appraisements made under the Antidumping Act of 1921 on the basis of cost of production, as defined in that statute. The principal difference between the definition there and that in section 402(f), *supra*, is that the former refers to "identical or substantially identical merchandise" rather than "such or similar merchandise." The merchandise in the case cited consisted of fish trap netting made from wire and zinc, the wire being made by drawing wire rods into wire. The rods were purchased in Germany (the country of manufacture) at a price which did not include a so-called "export rebate." The amount of said "export rebate" was added to the cost of the materials by the appraiser. The court held it was not a part of cost of production, stating (p. 296):

> From all the foregoing it is clear that there is substantial evidence to support the finding of the trial court to the effect that the manufacturer of the wire netting actually paid only 13,129.62 reichsmarks for the iron rods from which the wire was drawn. That was its actual cost to it, and there is no evidence of record that the manufacturer of this merchandise ever paid any more than this for wire rods to be used in the manufacture of identical or substantially identical merchandise. The cost of iron rods in Germany for purposes other than the manufacture of merchandise like that here involved is immaterial.

In the cases relied upon by appellant, *Swizzels, Inc.* v. *United States*, 38 Cust. Ct. 644, Reap. Dec. 8794, and *Schweppes (U.S.A.), Ltd.* v. *United States*, 43 Cust. Ct. 608, A.R.D. 111, the situation was reversed. In the case first cited, the price paid for materials used in the production of candy in England included an amount which was refunded upon exportation of the completed article as drawback.

It was held that since the cost of materials must be determined as of a specified time, which was at or prior to the date of manufacture of the merchandise, refunds received thereafter, when the merchandise was exported, might not be deducted.

The *Schweppes* case involved an excise tax paid by the British manufacturer at the time of purchase of ethyl alcohol used in the manufacture of the imported merchandise. The amount of the tax was refunded to the manufacturer on exportation of the finished product to the United States. It was held that the tax was part of the cost of materials, within the contemplation of section 402(f)(1), *supra*. The court pointed out:

> There can be no question here but that when the ethyl alcohol used in the production of the flavoring extract at bar was purchased, the cost thereof included the British excise tax in the amount of 212 shillings per proof gallon. Since that is the time made relevant by the statute, it is immaterial that, upon a later date, the contingency of exportation having been met, the tax was refunded.

In the instant case, at the time made relevant by the statute, no import duty had been paid or was due or had attached. Therefore, under the terms of the statute, it cannot be added to the cost of production of the materials entering into the imported merchandise.

This may appear to lead to inequities, in that if the tax is paid and refunded, it is a part of cost of production, but if it never attaches at all, it is not. As was pointed out in the *Schweppes* case, the remedy for this lies with the legislature and has, in fact, been provided in the Customs Simplification Act of 1956, which excludes from the determination of the cost of materials "any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used." (Section 402(d).)

For the reasons stated, we hold that it was error to add to the cost of production of this merchandise an amount representing an Irish import duty which never was paid or accrued or became due on the component parts of the merchandise but which might have been applicable to parts imported into Ireland to be used in the fabrication of automobiles for Irish consumption.

We find as facts:

1. That the merchandise involved herein consists of 25 Standard Anglia, 62 Anglia de Luxe, and 50 Prefect automobiles, which had been assembled by Henry Ford & Son, Ltd., Cork, Ireland, and sold to appellee.

2. That the component parts for the automobiles so assembled in Ireland had been imported from England, and, upon importation, no Irish import duties were paid or accrued or became due and owing.

3. That the instant automobiles were made to specifications applicable to the United States market; that they did not enter the commerce or trade of Ireland; that they differed from vehicles made for home consumption in important respects; that they were not commercially interchangeable nor adapted to the same use.

4. That there was no market value or price at the time of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale for home consumption or for export to the United States, to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, nor was there a price at which such or similar merchandise was freely offered for sale for domestic consumption, in the principal markets of the United States, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade.

5. That the cost of producing such automobiles, as prescribed by section 402(f) of the Tariff Act of 1930, was as follows:

|  | Standard Anglia | Anglia de Luxe | Prefect |
|---|---|---|---|
| Material and labor | £275.86 | £282.28 | £295.38 |
| Usual general expenses | 27.59 | 28.23 | 29.54 |
| Profit | 24.27 | 24.84 | 25.99 |
| Total, each | £327.72 | £335.35 | £350.91 |

We conclude as matters of law:

1. That there is no foreign, export, or United States value for the merchandise involved herein, as such values are defined in section 402(c), (d), or (e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

2. That cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise involved herein.

3. That Irish import duties, which were never paid or accrued or became due and owing on the component parts used in the production of such merchandise, are not a part of the cost of production thereof.

4. That the cost of production of such merchandise is that shown in finding of fact No. 5, *supra*.

The decision of the trial court is affirmed.

### CONCURRING OPINION

DONLON, Judge: I concur. Appellant's argument is that statutory value should be constituted of actual items of the cost of production of *such* merchandise, plus an item of cost of production of merchandise which appellant contends is *similar*. Even if it were similar

merchandise, and on the record before us it is not, there is no statutory authority for such commingling of cost factors of both such and similar merchandise in order to arrive at value.