**PAN AMERICAN AIRWAYS, Inc.**

v.

**UNITED STATES.**

**C. D. 1851, Protest No. 139617–K.**

United States Customs Court
Third Division.
March 5, 1957.

570

Joseph J. Cantwell, New York City, for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Mollie Strum, Trial Atty., New York City, for defendant.

Before JOHNSON and DONLON, Judges.

DONLON, Judge.

The issue before us here is whether the United States Government may lawfully exact certain charges from plaintiff for regular customs services rendered after regular work hours, in connection with the arrival of civil aircraft within the United States on flights from a contiguous foreign country. Plaintiff is the owner and operator of such aircraft.

Plaintiff, a scheduled airline, had filed its regular flight schedule, as required, with the collector of customs for the 23d, or Laredo, district, in which Brownsville airport is situated. Plaintiff's planes, the subject of this litigation, arrived at International Airport in Brownsville,

Tex., an airport of entry, on flights from Mexico, at hours outside the regularly scheduled workday of personnel assigned by the Treasury Department to customs work at that airport. Certain customs officers and employees were, at plaintiff's request, available to perform, and they did perform, out-of-hours customs services in connection with the arrival of these planes. Pursuant to usual practice, the collector invoiced plaintiff for sums equivalent to overtime pay of customs employees for services rendered. Plaintiff paid to the collector the charges exacted, and the collector turned over to each of the customs officers and employees, who had been available to perform or had performed services, the sum representing payment for his overtime service.

It is these overtime charges which the plaintiff's protest attacks as unlawful exactions.

Two flights gave rise to the exactions here protested. One flight arrived at Brownsville International Airport on March 3, 1948, at or about 8:55 p. m. The other flight arrived at the same airport on March 9, 1948, at or about 7:30 p. m.

In connection with the first flight, customs officers and employees were available, and charge was made for their services, during the period from 6 p. m. to 9:20 p. m., on March 3, 1948. In connection with the second flight, customs officers and employees were available, and charge was made for their services, during the period from 6 p. m. to 8 p. m., on March 9, 1948.

This litigation has to do chiefly with a question of law, namely, whether the Government had the right to require plaintiff to pay the protested charges. Plaintiff contends that there is no authority for this exaction either in the statutes or in the regulations, arguing that owners and operators of civil aircraft arriving from contiguous foreign territory are not required to make such payment. Plaintiff contends, alternatively, that the only overtime services for which payment could be exacted, in any event,

would be services in connection with the operations of lading and unlading and that the services here rendered were in negligible part (or not at all) for lading or unlading.

The record in this case was developed over a considerable period of time. The briefs filed are voluminous. However, in large part, the record and briefs are concerned with issues that are not, in our opinion, decisive of this litigation.

█ The issue which we regard as decisive is that plaintiff is a common carrier, subject by act of Congress to the tax that was exacted.

Congress has, by statute, imposed on "common carriers" the liability for the exaction here litigated. This liability we hold to be a tax, in the nature of an excise or license tax. We hold, on the record before us, that plaintiff is, in fact and in law, a common carrier subject to this tax.

Section 451 of the Tariff Act of 1930, was amended June 25, 1938, Ch. 679, § 9, 52 Stat. 1082, 19 U.S.C.A. § 1451. It is section 451, as thus amended, which brings common carriers, as such, within the tax liability of that section and enlarges the scope of the tax.

Prior to the 1938 amendment, section 451 of the Tariff Act of 1930 contained the limitations on which so much of plaintiff's case is predicated. It then made no mention of common carriers. It then measured liability by services in connection with lading and unlading, both as to vehicles and vessels. (As to vessels, other services were also mentioned.)

The 1938 amendment, effective in March 1948, when plaintiff's aircraft arrived at Brownsville airport, expanded the scope of section 451 in two respects, both significant to our decision.

First, common carriers were brought under the section. They were included for the first time *by name* among those who might request and obtain overtime customs services and among those who were required to pay for such services.

Second, this right and the correlative obligation were no longer limited to services in connection with lading and unlading. Broadly expressed, in the language of the amendment, "overtime services" might be requested by common carriers, and were to be paid for, without limitation as to the customs functions in which such services were required or rendered.

These provisions are found in the following language of section 451, as amended:

"*  *  * *Upon a request made* by the owner, master, or person in charge of a vessel or vehicle, or *by or on behalf of a common carrier* or by or on behalf of the owner or consignee of any merchandise or baggage, *for overtime services of customs officers or employees at night or on a Sunday or holiday,* the collector shall assign sufficient customs officers or employees if available to perform any such services which may lawfully be performed by them during regular hours of business, but only if the person requesting such services gives a bond in a penal sum to be fixed by the collector, conditioned to pay the compensation and expenses of such customs officers and employees, who shall be entitled to rates of compensation fixed on the same basis and payable in the same manner and upon the same terms and conditions as in the case of customs officers and employees assigned to duty in connection with lading or unlading at night or on Sunday or a holiday. Nothing in this section shall be construed to impair the existing authority of the Treasury Department to assign customs officers or employees to regular tours of duty at nights or on Sundays or holidays when such assignments are in the public interest:  *  *  *."
[Emphasis supplied.]

While the proofs as to common carrier status before us are but a small part of an extensive record, these proofs show (1) that counsel stipulated, on trial, that "the plaintiff, Pan American Airways, Inc., *  *  * is a corporation organized and existing under the laws of the State of New York and engaged in the business of overseas and foreign air transportation, as defined in Section 1, Sub. 21, of the Civil Aeronautics Act of 1938 as amended" (R. 31); (2) that a certificate of public convenience and necessity was issued to Pan American Airways, Inc., authorizing it to engage in air transportation with respect to persons, property, and mail between various terminal and intermediate points, including Brownsville, Tex., and stated points within Mexico (defendant's exhibit E); (3) that Pan American Airways, Inc., executed and filed with the collector, on customs Form 3587, a carrier's bond requesting "to be designated as a common carrier for the transportation and safekeeping of merchandise entered or withdrawn for transportation or for transportation and exportation in bond" (defendant's exhibit G); and (4) that plaintiff did, in fact, transport passengers and baggage, at least on the flight of March 9, 1948 (R. 56, et seq.).

Plaintiff and defendant both lean heavily on the language of section 401, subdivision (21), of the Civil Aeronautics Act, 49 U.S.C., 1946 ed., 49 U.S.C.A. § 401. To us, it seems clear that section 401, subdivision (21), does not constitute plaintiff a common carrier. What it does provide is merely that, if plaintiff is a common carrier between a place in the United States and any place outside thereof, then it may be deemed engaged in foreign air transportation for purposes of the Civil Aeronautics Act. Status as a common carrier is to be determined outside that section. In the absence of statute, it is to be determined by applying the principles of common law.

It is stating the obvious to observe that air transport is a late arrival in the common carrier field. Not all problems are, even yet, judicially defined. However, the courts have spoken on the issue of common carrier status.

An early case holding that the operator of aircraft to carry passengers for compensation is a common carrier, is Curtiss-Wright Flying Service, Inc., v. Glose, 66 F.2d 710. Inasmuch as writ of certiorari was denied by the Supreme Court, 290 U.S. 696, 54 S.Ct. 132, 78 L. Ed. 599, the decision of the Court of Appeals for the Third Circuit may be deemed the law.

Suit was brought to charge defendant with negligence as a common carrier, and the Court of Appeals affirmed the decision of the district court, which held defendant liable as a common carrier. Discussing the then-novel issue as to whether air transportation comes within the scope of common carrier liability, the Court of Appeals, in an opinion by Judge Buffington, said, 66 F.2d at pages 712, 713:

"* * * Now the policy of law is settled that common carriers, in dealing with passengers, cannot compel them to so release their legal liability for their own negligence. [Citing authorities.] Such being the settled law, why should it not be applied to airplane passenger service? What reason is there why the same principles applicable to land and water should not also be applied to air transportation? * * * All alike perform the same service, viz., transportation. They are competitors for the same class of business. Every passenger carried by airplane means a passenger less for the railroad or the steamship. Transportation, as its derivation denotes, is a carrying across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result. Since, then, the three stand as, in substance, the same, it remains to inquire whether the defendant was a common carrier, for, if it is, its attempted limitation of an injured passenger to recover full compensation for loss due to its negligence is invalid. While the charter of the defendant is not before us, the fact that it received a charter from the state is shown, and we are therefore warranted in regarding the things it did were done pursuant to the provisions of its charter. What did it do? It held itself out to the public as performing the things done by a common carrier. It solicited the patronage of the traveling public. It advertised schedules for routes, times of leaving, rates of fare. It established general rules and regulations. It published schedules which stipulated what baggage the passenger might carry, and added the usual condition for passenger-carrying service, that excess baggage would be charged for at published rates. It will thus be seen that, in all its approach to the public and in its rendering service to the public, defendant did precisely what railway and steamship lines do, and it sets the stamp of its common carrier character by coming in competition with rail and steamship lines. And in that connection it is to be noted that the railroads have regarded airplanes as doing a service identical with their own by providing a joint service of rail and air in long-distance travel. Regarding defendant as in fact a "common carrier," the trial court committed no error (as also, as well as in other particulars) in holding it liable for damages in excess of $10,000. * * * *"

Plaintiff here argues that, although it concedes common carrier status for many purposes, it is not a common carrier under the tariff act. This argument is based on the fact that Congress has excluded aircraft from the definition of "vessels" and "vehicles" in the tariff act. There is no doubt as to that exclusion. Plaintiff's argument fails to show that only the operators of "vessels" and "vehicles," as defined in the tariff act, are common carriers under that act. The argument, therefore, is unconvincing.

If common carriers, under section 451, were limited to those who operate vessels and vehicles, plaintiff's argu-

574

ment might have merit. That, however, is not the case. Except as limited by the statute itself, the term "common carrier," as used in section 451 of the tariff act, must be deemed to include all who transport for compensation passengers or goods or mail. Ferries, bridges, tunnels and pipelines may be common carriers. So, too, aircraft may be common carriers. The definition derives from common law, as judicially construed. The meaning of common carrier, as used in section 451, has been limited by statute with respect to certain carriers. It has not been limited as to aircraft.

Congress seems to have understood that aircraft operation came within the scope of section 451. This is shown by events that occurred in 1944. Attempt was then made, in the House, to amend section 451 so as to exclude aircraft from the tax burden of that section, as certain common carriers already were. The history of that attempt to exclude aircraft is worth noting, as revealing congressional intent. It is set forth in the reported debate on an amendment which, if it had been enacted, would have relieved these aircraft of this tax burden. (90 Cong.Rec. 5012, 78th Cong., 2d session, May 18, 1944.)

The following excerpt of remarks of Honorable Daniel J. Reed in floor debate is taken from page 5012 of the record, *supra:*

"My opposition is to the elimination of what was put in the bill by a unanimous vote of the Ways and Means Committee.

"The part eliminated was an amendment to provide the same free inspection service for airplanes on the boundary between Mexico and the United States and on the boundary between Canada and the United States.

"The planes at these two boundary lines land and leave under military orders, yet they will be obliged to pay overtime for inspection service on Sundays and holidays, in fact at all times.

"What reason—or rather, excuse —is given for this discrimination? A whispering campaign from burreaucratic sources that unless airplanes are eliminated from fair treatment, the President would veto the bill."

Notwithstanding this opposition, the bill, as voted, did eliminate the proposed amendment to section 451 to provide "free inspection service" for airplanes arriving from contiguous foreign territory.

So much for plaintiff's status as a common carrier within the purview of section 451. The other conditions basic to the asserted liability were met. This is not disputed. Plaintiff duly requested overtime services of customs officers and employees. The requested services were made available. Plaintiff's bond was filed, as required. The amount exacted was correctly measured by the statutory formula, so far as the record shows. Plaintiff paid the exaction and then filed its protest.

This exaction has been characterized as a tax by the United States Supreme Court. International Railway Co. v. Davidson, 257 U.S. 506, 42 S.Ct. 179, 66 L. Ed. 341. Justice Brandeis, writing for the unanimous Court, said 257 U.S. at pages 514, 515, 42 S.Ct. at pages 182, 183:

" * * * To collect the cost of customs service from vessel owners or others is virtually laying a tax upon them. This cannot be done except by specific authorization of Congress. * * * It was this lack of power in the Secretary to impose upon others any part of the cost of the customs service *unless specially authorized by Congress* which led to the enactment also of the earlier legislation concerning special licenses for lading and unlading of cargoes. * * * " [Emphasis supplied.]

No authority is cited to us in support of this exaction other than as a tax. It would be repugnant to the established principles of customs law to construe sec-

tion 451 as expressing a congressional intention to create, between plaintiff and customs employees, the relation of master and servant, with resultant obligation on the master to pay wages or salaries. Congressional intent to do this should not be inferred. If intended, it ought to be clearly expressed, in view of long-established prohibitions against payments to customs personnel. Act of March 3, 1917, ch. 163, 39 Stat. 1106, 5 U.S.C.A. § 66.

Plaintiff argues that, if we should hold this to be a tax on common carrier owners as operators of aircraft, it is a tax unlawfully discriminatory, in that it is not also laid on the owners and operators of other aircraft who are not common carriers. To state this argument is, in our opinion, to refute it. Taxation that is laid on a reasonably selected class of taxpayers is lawful taxation. Common carriers constitute a class reasonably selected as to this tax. It is not for us to say that some other or broader class of taxpayers should have been selected by Congress. Provided the class selected is reasonable in relation to the tax laid, and we hold that it is, we do not substitute our opinion as to class for the opinion of Congress. The constitutional prerogative and duty to define a class for purposes of taxation is the proper function of Congress, not of the courts.

Our holding that this exaction is a tax, following Justice Brandeis in the International Railway Co. case, supra, disposes of plaintiff's argument that here there was a taking of private property for public use without just compensation, in violation of the fifth amendment to the Constitution.

In the light of our decision that the protested exactions are taxes that were validly imposed on plaintiff as a common carrier, pursuant to statute, it is not necessary to state opinions as to the many arguments that are addressed by the parties to other theories. Hence, we do not need to consider whether this tax would be unlawfully imposed by regulation, or by similitude to vehicles from contiguous foreign territory, or for services only in lading and unlading, or as agent of passengers, rather than as principal. To do so, would be to expand our opinion by extended consideration of the record and of statutes and regulations in relation to matters which our decision makes irrelevant to the issue before us.

The protest is overruled. Judgment will be entered for defendant.