INTERNATIONAL PACKERS, LIMITED
v.
UNITED STATES.
Reap. No. 286249-A.

United States Customs Court.
Jan. 26, 1959.

Barnes, Richardson & Colburn, New York City, J. Bradley Colburn, New York City, of counsel, for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Daniel I. Auster, Trial Atty., New York City, for defendant.

DONLON, Judge.

Merchandise imported from the Argentine was appraised at United States value, and this was the same basis of valuation as that at which the merchandise was entered. While the appeal to reappraisement, as filed, broadly encompasses all merchandise of the entry, plaintiff on trial limited its appeal to merchandise which is identified in the entry papers as canned corned beef.

The basic component of United States value is United States sale price. There is no dispute as to the United States sale price of such canned corned beef. This litigation is concerned with the deductions from United States sale price that are permissible, by statute, in order to arrive at United States value for appraisement purposes.

Plaintiff claimed certain items as such deductions. Some of these were allowed by the appraiser. Of three items that were disallowed, plaintiff here appeals only as to one. This is a charge, or tax, which was withheld in the Argentine, by the Government there, before remitting to the exporter of the merchandise the peso proceeds of dollars which the buyer paid for the merchandise.

The chief issue is whether this Argentine retention charge, or tax, is a necessary expense from the place of shipment to the place of delivery of the merchandise, within the purview of section 402 (e) of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1402(e). There is also an issue as to the exchange rate at which Argentine pesos should be converted into dollars, in computing the deductions. I shall defer consideration of the issue as to exchange rate, until I have first disposed of the issue as to whether the Argentine retention charge, or tax, is an allowable deduction.

The parties have stipulated that on or about the date of exportation of this was not freely offered for sale in Argentina, either for home consumption or for export to the United States. (R. 4.) That being so, the appropriate basis of appraisement is United States value, if such value can be ascertained. The facts here of record make it evident that the United States value of such merchandise can be ascertained.

Section 402(e) of the Tariff Act of 1930, as amended and in effect during February 1956, § 402a(e), when this merchandise was exported, provided as follows:

"The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission

not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods."

It is stipulated that the price at which such imported canned corned beef was freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, was $5.05 per unit of a dozen tins, 12 ounces, less 1 per centum cash discount, $0.0505, or a net United States unit price of $4.9995.

Allowances for ocean freight, insurance, general expense, and profits, aggregate $0.9617 per unit. These allowances are not in controversy.

Certain other charges (identified in the stipulation as loading permit, stamp on bill of lading, Argentine statistical charges, exchange stamp tax, export sales tax, lucrative charge, and placing on board charge) were allowed, but plaintiff disputes the exchange rate which the appraiser used to convert the amount of these charges from Argentine pesos into United States dollars. The appraiser converted at a rate of 15.3 pesos per dollar. Plaintiff claims that conversion should have been at a rate of 18 pesos per dollar.

The appraiser made no allowance for the 15 per centum Argentine retention charge, or tax. The allowance for duty, computed at the ad valorem rate of 20 per centum, should be adjusted if the adjustments in allowances, for which plaintiff contends, are found to be proper.

Foreign law is a fact which is to be proved. Pierce v. Indseth, 106 U.S. 546, 1 S.Ct. 418, 27 L.Ed. 254. The official resolutions, proclamations, and decrees imposing the Argentine charge, or tax, here in issue, have been proved by intro-duction into the record of duly certified copies of original documents in the Spanish language, together with translations into English.

These documents are extensive and the provisions are complex, but for purposes of this opinion the matter chiefly significant to this decision may be extracted and summarized.

In the latter part of the month of October 1955, the Argentine Government found it necessary to readjust foreign exchange controls, so as gradually to work toward a free market. (Recent events indicate that these 1955 measures did not fully accomplish the desired objective.) A comprehensive scheme for controlling foreign exchange transactions was instituted. The controls extended *inter alia* to certain imports and exports.

It was decreed that part of the proceeds from the negotiation of foreign exchange arising from controlled exports should be retained by the Government and that this retention should be "of a movable character in order to permit its easy adaptation to the trends of the prices of the domestic and international markets * * *." The first three articles of Decree 2002/55, dated October 27, 1955 (exhibit 5), set forth the manner in which particular retention amounts were to be authorized, as follows:

"Article 1.—When proceeding with the liquidation of the negotiations of the foreign exchange arising from exports, the banks and authorized institutions shall retain up to 25% of the amounts in Argentine Pesos from the said liquidation.

"Article 2.—The retention established by the foregoing article shall be allotted to the National Economic Re-establishment (Recovery) Fund.

"Article 3.—The Ministries of Commerce and of Finance shall issue the lists of the products on which there shall be effected such reten-

tion, as well as the respective amount."

It has been stipulated that canned corned beef was exportable merchandise for which retention at the rate of 15 per centum had been authorized and was in effect in connection with the foreign exchange arising from export of the instant merchandise. This stipulation is confirmed by certified excerpts, introduced into the record, from the official list of exportable products promulgated under Decree 2002/55.

This Argentine retention charge, instituted in 1955, seems not to have come before this court previously. Both parties, in their briefs, refer to United States v. International Commercial Co., Inc., 28 Cust.Ct. 629, Reap.Dec. 8112, in which the first division of this court affirmed (one judge dissenting) the decision of the trial judge in International Commercial Co., Inc. v. United States, 26 Cust.Ct. 607, Reap.Dec. 7980.

The court there held that a "charge" of 20 per centum upon the full f.o.b. Buenos Aires value of canned beef exported in 1947, imposed by the Institute Argentino de Promoción del Intercambio (referred to as I.A.P.I.), did not accrue until the merchandise was about to be exported and, therefore, was a charge or expense that accrued after the merchandise was packed, read for delivery or shipment. Hence, the court held the appraiser had erred in adding this 20 per centum I.A.P.I. charge to *export* unit price.

Plaintiff argues that the basis of valuation here is United States value, not export value in Argentina; that there is no controversy as to United States selling price of this merchandise; that the retention here is, in legal effect, similar to the I.A.P.I charge in the International case; that inasmuch as the court there held the charge did not accrue until after the merchandise was packed ready for shipment and, hence, should not be added to export price in order to arrive at export value, it follows that this retention is a necessary expense "from the place of

shipment to the place of delivery" of this merchandise, to be deducted from United States selling price within the design of the statutory provision for computing United States value.

The decision here turns on whether this retention of 15 per centum is, or is not, a necessary expense, as plaintiff claims that it is, "from the place of shipment to the place of delivery" of this merchandise.

Defendant's first argument is that this retention is not a tax. Plaintiff calls it a tax, but does not rest its arguments on the fact of tax status.

It seems to me unnecessary, for purposes of this decision, to characterize this Argentine exaction either as a tax or as not a tax. There is little doubt that, if this were an exaction by the Government of the United States, it would be an excise tax, by whatever name called. International Railway Co. v. Davidson, 257 U.S. 506, 42 S.Ct. 179, 66 L. Ed. 341; Pan American Airways, Inc. v United States, 38 Cust.Ct. 110, C.D. 1851

Defendant rests its position in part on an assertion that the retention charge does not have the usual tax purpose of collecting revenue for the use of the Government or for the public benefit. The record before me does not bear this out.

General Resolution 411(V) of the Ministry of the Treasury, General Internal Revenue Office (exhibit 8), characterizes the "withholdings" (here so translated, but obviously referring to the "retentions"), made by banks and authorized institutions, as made for the "National Economic Reestablishment Fund."

Decree 2004/55 of the Ministry of Finance of the Argentine Republic (exhibit 5) allots to the National Economic Recovery Fund certain "resources," including "withholdings" under Article 1 of Decree 2002/55, and provides that the resources of said fund "shall be applied exclusively to the technological and economic advance of agriculture-cattle raising production of Argentina and to the payment of transitory subsidies which

may possibly be established in order to attenuate the indicence [sic] of the prices of the former on the cost of living."

In the basic considerations set forth in Decree 2002/55, it is recited that the "resources" obtained from the retention "must be applied exclusively to the stimulation of agricultural-cattle raising production and to the payment of subsidies of an eminently social character * *."

It would appear that this is revenue collected for the use of the Government and for the public benefit. But whether or not the retention is technically a tax, under Argentine law, does not conclusively determine its status as a charge exacted by the Argentine Republic in connection with the export of this merchandise.

Defendant's second point of argument is that this retention charge is neither an item which is expressly enumerated in section 402(e), as an allowable item, nor is it a necessary expense from the place of shipment to the place of delivery within the purview of section 402(e). Inasmuch as plaintiff's case, on the facts of record, does not rest on any claim that the retention charge is one expressly enumerated in section 402(e) as an allowance, but does rest on the claim that it is a necessary expense from the place of shipment to the place of delivery, I confine consideration at this point to the arguments, pro and con, which are addressed to the argued issue.

■ Plaintiff's brief recites that research of counsel has disclosed no case directly in point, but cites International Commercial Co., Inc. v. United States, supra, with recognition that there are significant differences. The issue there was export value in Argentina and not (as here) United States value of merchandise imported from Argentina. However, by analogy to the decision in the International case, plaintiff argues that the Argentine retention charge accrued upon export of the merchandise from Argentina and, hence, that it is an allowable expense from the place of ship-

ment to the place of delivery, within the purview of section 402(e).

Defendant, arguing contra, cites several decisions in support of its contention that the Argentine retention charge is not allowable under section 402(e), because it is not an expense from the place of shipment to the place of delivery. I shall now consider the precedents defendant has cited for this proposition.

In John H. Faunce, Phila., Inc. v. United States, 25 CCPA, Customs, 131, the stipulation before the court recited that the "United States selling price of $1,-029.10 included an item of $144.58 which represented an excise tax of 2 cents per M Matches." United States selling price was not in controversy there, as it is not in controversy here. The issue in the Faunce case was whether United States internal revenue tax on imported matches was a necessary expense from the place of shipment of the matches in the foreign country to the place of their delivery in the United States. The court found that it was not such an expense as Congress intended in enacting section 402(e), holding that United States internal revenue tax is a charge which is incurred after delivery of the imported matches. For that reason, the tax was held not allowable as an expense from the place of shipment in the foreign country to the place of delivery in the United States. Pointing out that customs duties, which accrue at the time when goods are imported into the United States, are not allowable by virtue of the "necessary expense" provision of section 402(b), but by special provision which Congress has made for the allowance of customs duties, the court said:

"If customs duties are not a necessary expense, within the purview of the language of the statute under consideration, it certainly is not reasonable to suppose that the Congress ever contemplated that internal-revenue taxes, which might not accrue for years after the delivery of imported merchandise, should be considered a necessary expense from

the place of shipment of imported merchandise to the place of its delivery." [at page 135.]

In Stoeger Arms Corp. v. United States, 40 Cust.Ct. 887, A.R.D. 86 (affirmed 46 CCPA ——, C.A.D. 696), also cited by defendant, the issue was whether United States internal revenue tax on rifles is a duty or, alternatively, a necessary expense within the purview of section 402(e). The court held that the United States internal tax on rifles was neither, and, hence, that it could not be deducted from United States selling price in order to arrive at United States value.

Allowance for United States internal revenue tax was likewise the issue in Happel (Burleigh Brooks) v. United States, 69 Treas.Dec. 1404, Reap.Dec. 3809, an old case which defendant also cites. The Happel case is discussed in the Stoeger Arms opinion, and this discussion need not be repeated here.

In International Forwarding Co., Inc. v. United States, 6 Cust.Ct. 881, Reap. Dec. 5197, the issue was whether countervailing (United States) duty was a *customs duty* under section 402(e). The court held that Congress contemplated, in section 402(e), the allowance of *regular* customs duties only, and that countervailing duty *was not allowable as a customs duty*.

In Swizzels, Inc. v. United States, 38 Cust.Ct. 644, Reap.Dec. 8794, the issue was whether a drawback of 11 shillings, 8 pence, per hundredweight, received in England by the exporter of candy balls from England, was a factor proper to computation of the cost of production of the merchandise in England. There was no issue in the Swizzels case as to computation of United States value.

In Schweppes (U.S.A.), Ltd. v. United States, 41 Cust.Ct. ——, Reap.Dec. 9180, cited in defendant's brief, the basis of appraisement was also (as in the Swizzels case) cost of production under section 402(f), and not (as here) United States value under section 402(e).

Neither in section 402(f), specifying what enters into cost of production, nor in section 402(d), specifying what enters into export value, is there any language comparable to that of section 402(e) specifying what necessary expense deductions are to be made from United States selling price in order to arrive at United States value. It is the language of section 402(e) which is now before the court. Therefore, cases which construe *other and different* statutory formulae for appraisement of imported merchandise are not controlling of the decision here. Indeed, for the most part they offer no help at all, because of the differences in statutory language to be construed.

It may be useful to observe that the cases which defendant cites do not hold that the items there in dispute were not expenses. What these cases do hold is that such items were not relevant to the statutory basis of appraisement before the court in a particular case. Where appraisement was at United States value, and the claim was for allowance as an expense and not as a duty, the cases cited by defendant had to do only with United States internal revenue taxes. It was held that such taxes are not an expense *from the place of shipment in the foreign country to the place of delivery in the United States*, but are an expense *after* delivery. Hence, these cases are not useful as a guide in deciding whether the Argentine retention charge now before the court is or is not such an expense as is timed *within* the statutory period for expenses allowable under section 402(e).

That the retention charge is an item of expense having some connection with export of this merchandise from Argentina, is evident from the facts of record. The issue is whether the Argentine retention charge is a "necessary expense" within the purview of section 402(e). Defendant disposes summarily of this, the salient issue in the case. Defendant's brief (p. 11) states, as to allowability of the Argentine retention as a "nec-

essary expense" within the purview of section 402(e), as follows:

"* * * it [claim for allowance as a necessary expense] is not warranted, for it is not included as 'other necessary expenses from the place of shipment to the place of delivery.'

"It is a retention *after payment* in connection with foreign exchange received for merchandise exported and not in connection with either the sale or delivery of the merchandise." [Emphasis copied.].

In presenting this brief statement as conclusive of its argument of this important issue, defendant gives the court no information as to those parts of the voluminous record on which it relies for support of this position. Thus, the brief fails in that helpfulness to the court which is its purpose. The issue requires more critical scrutiny of a considerable volume of evidence than defendant seems to think necessary.

There is in evidence the affidavit of one T. C. Skidmore, verified January 10, 1958, before the vice consul of the United States of America in and for the consular district of Buenos Aires, Argentina. (Exhibit 10.) Mr. Skidmore identifies himself as Thomas Charles Skidmore, director and treasurer of Compañia Swift de la Plata, S. A., of Buenos Aires. He states that he is personally familiar with the procedure for export of canned meats from Argentina and knows, of his own personal knowledge, of the procedure that was required to be followed in the instant shipment, as set forth in the documents attached to his affidavit. He also states that he knows that the Spanish language documents and their respective translations, attached to his affidavit, are true and correct.

Detailing what took place, and referring to documents, certified copies of which, with translations, are attached to his affidavit, Mr. Skidmore states as follows:

"Under existing regulations of the Government of Argentina all exports of canned meats must be approved by the Junta Nacional de Carnes (National Meat Board). At the time the aforementioned shipment took place this Board was called Instituto Nacional de Carnes. For all products approved by the Junta Nacional de Carnes (Corned Beef, Corned Mutton, Roast Beef, Beef with Natural Juices), we, on receipt of a cabled bid apply to them for an Export License by means of the enclosed specimen copy of a 'Propuesta de Operación Calzada' (Specimen 1). Approval is generally granted within 24 hours.

"Once the approval is in our hands and shipping space has been obtained, the next step is to obtain the Loading Permit (Specimen 2). To obtain the Loading Permit it is first necessary to furnish the details in the 'Solicitud de Embarque' (Specimen 3) as per the attached specimen copy and present the certificate to the Junta Nacional de Carnes who checks these details against the Export License (Specimen 1). Provided the details in specimen 1, 2 and 3 are in agreement, the Junta Nacional de Carnes place their approval on specimens 2 and 3 and return both to us.

"According to the Argentine Central Bank regulations, all official market exports from the country must be made against pre-payment or an irrevocable letter of credit opened before shipment. Our Canned Meat shipments to the U.S.A. were made against a revolving irrevocable letter of credit. In view of this we are obliged to go to the bank through which the irrevocable letter of credit (with telegraphic reimbursement), has been opened to obtain the bank's certification on the 'Solicitud de Embarque' (Specimen 3) to the effect that the letter of credit has been received. At the same time the bank issues an exchange cover form No. 2991 No. 4441 (Specimen 6) on which is

shown the total exchange to be delivered and the rate at which it is to be liquidated. This form which serves as proof that exchange has been covered prior to shipment, is delivered to the Customs authorities together with our Loading Permit application and 'Solicitud de Embarque' (Specimens 2 and 3).

"Under the Letter of Credit system of payment, the banks liquidate the funds to us against the presentation of documents specified by the letter of credit and form 3024 (Specimen 4). This form 3024 (Specimen 4) 'Certificado de Embarque para negociar cambio' is prepared after shipment has been effected and shows the exact details in respect to type of product loaded, price, weight, total value. The form is presented to the Customs who check to see that it is in accordance with the Export License, Loading Permit and 'Solicitud de Embarque' and if found in order the 'Certificado de Embarque para negociar cambio' form 3024, (Specimen 4) is signed by them and returned to us for further handling together with exchange form 2991 N 4441 (Specimen 6). Form 3024 together with 2991 N 4441 (Specimens 4 and 6) are then delivered to the local bank.

"Under Argentine Central Bank Circular No C. 2296 of October 28, 1955, issued pursuant to Decree No 2002 of October 27, 1955, the foreign currency resulting from the export of various products including canned meats must be negotiated in the official market at the exchange rate of 18 pesos for each U.S. dollar. Further pursuant to the said Circular and Decree, a retention tax of 15% of the exchange resulting from such exports was levied. Said 15% tax was assessed against the full amount of the exchange proceeds which specifically represented in the case of Canned Corned Beef, the full

F.O.B. dollar value of the product exported.

"In liquidating the letter of credit the bank first converts the U.S. dollars to Argentine pesos at the rate of 18 Argentine pesos to 1 U.S. dollar and then deducts the 15% retention tax from the total peso equivalent according to the Argentine Central Bank Circular C. 2312 (Specimen 5a). The purpose of Circular C. 2312 (Specimen 5a), which is an inter-Bank circular, is to instruct the local banks how to liquidate the 15% retention tax as stated in the Argentine Central Bank Circular C–2296. All exchange sold to the private banks in the official market comes under the control of the Central Bank. In fact, a position account is carried by the banks and all sales and purchases of exchange have to be declared daily to the Central Bank. At the close of each day balances are established and if favourable to the Central Bank, this institution may call upon the private banks to deliver exchange up to the amount of said balances. Viceversa, the private banks are entitled to draw up to the amount of the balances if these should be in their favour. Once all the documents have been received by the bank and revised by them our account is then credited and we receive a copy of the bank liquidation form (Specimen 5). The particular shipment in which we are interested has been underlined by us on this form."

One of the attachments to Mr. Skidmore's affidavit (Specimen 1) is a Spanish language document entitled "Propuesta de Operación Calzada," with an English language translation that is entitled "Authorization for Transaction Performed." This is numbered 00798. Through this document, the National Meat Board authorized "International Packers Commercial Division" (not elsewhere identified, but from other documents and statements of record it is rea-

sonable to assume that it is a division of International Packers, Limited, plaintiff herein) to ship to the United States within 120 days after February 10, 1956, 40,000 boxes of "Corned Beef 24/340 First Quality (preserved bovine meat)." There are, in this document, specifications as to the weight of the merchandise per box and in aggregate, stated in kilograms, and also the unit value and aggregate value of the merchandise, stated both in Argentine pesos and in United States dollars as well as the official rate of exchange applicable to this export transaction.

This document, the Authorization for Transaction Performed, is described in Mr. Skidmore's affidavit as the way in which, on receipt of the cabled bid of the buyer for merchandise, his company applied for an Export License for that merchandise. This document bears date February 10, 1956; but it also has February 8, 1956, as the date of the official rate of exchange, 18 pesos to the dollar, approved for this transaction. There is no reason to suppose that this difference of 2 days is of materiality, save only as it indicates that approval of the foreign exchange rate for the export transaction antedated the official license that was granted permitting export of the merchandise.

The second step in the procedure for export of the merchandise, after the Export License had been obtained and as detailed in Mr. Skidmore's affidavit, was to get the Loading Permit, to lade the merchandise on a designated ship. Mr. Skidmore explains that the original Loading Permit is kept in the archives of the Buenos Aires Customs House and that it was not available to him to send to the court, but that the attached Specimen 2 is a photostatic copy of the Loading Permit that was issued authorizing lading of this merchandise. This document is entitled in Spanish "Boleto de Embarque" and, in English translation, it is called "Shipping Document."

The Shipping Document, or Loading Permit, is endorsed by the Ministry of Commerce of the Argentine Republic, National Meat Board, and recites (in that endorsement) "Shipment allowed. February 21st, 1956." There are several other endorsements on the Shipping Document. One is by a customs broker; one endorsement, by the "Division, Register and Proceedings," under date of February 22, 1956, grants the right of shipment to be "made after examination of the goods by the relevant offices of the Custom House"; one endorsement is by Raul Larrabure, of the Seventh Section of the Harbour, dated February 23, 1956, reciting that "The Custom House Officer, Gonzalez, examined the goods"; there is an endorsement "February 23rd, 1956.— Received and approved"; and, finally, on this much endorsed Shipping Document, or Loading Permit, there is the following endorsement: "February 23rd, 1956.— Puerto Nuevo Seventh Section. February 23rd, 1956.—Shipped as per notes on margin of the annexed certificate of Animal Health N. 3024/91602.—The shipment was made on lighter S. 9 carriage bill N. 330 from Rosario," following which is stamped: "Florentino V. Gonzalez, Customs Officer."

The merchandise embraced in this Shipping Document is not the entire 40,000 boxes of corned beef for which Export License (Specimen 1) was issued on February 10, 1956. The Shipping Document (Specimen 2) relates only to 5,000 boxes of corned beef, permitted to be shipped "on the North American vessel Brazil, with destination to New York * * *." Except that the number of boxes then permitted to be shipped was only 5,000, the details as to merchandise and price correspond with the similar details stated in the Export License for 40,000 boxes, of which the instant 5,000 are a part.

As Mr. Skidmore points out in his affidavit, foundation for the Shipping Document is laid by still another document in evidence (Specimen 3). This is entitled "Application for Shipment." In this application, the date of the "transaction" is identified as February 10, 1956 (which is the date of the export transaction approved, Specimen 1).

The Application for Shipment related to 5,000 boxes, which is the same quantity for which Shipping Document (Specimen 2) was issued by the Argentine authorities. These 5,000 cases of Libby corned beef, 24/12 ounces, are identified by Mr. Skidmore (statement of January 9, 1958, incorporated in his affidavit) as included in the 40,000 cases for which the Authorization for Transaction Performed (Specimen 1) was issued.

Important in resolving the issue before the court, the Application to Ship (Specimen 3) states the terms of the export transaction as to which the Shipping Document (Specimen 2) was issued and as to which it was checked by Government officials, as indicated by the several endorsements on the Shipping Document.

Inasmuch as it is the Argentine retention charge which is here in issue, it is not necessary to recount again the detailed description and quantity of merchandise, the country and port of destination, and other particulars, save only those items that relate to price and foreign exchange.

The f.o.b. value is stated in Argentine currency per box as 117,00 pesos. The total f.o.b. value of the 5,000 boxes, in Argentine currency, is stated as 585.-000,00 pesos and, in United States currency, as $32,500. Applicant, the exporter and shipper, Cia. Swift de la Plata, S.A., declared under oath, immediately following the statement as to 15 per centum retention, that it would not receive a higher price than the price "mentioned above."

As to payment, the Application for Shipment has the following endorsement, made by Lorenzo W. Hughes, custom broker:

"Official Exchange,—Form 3024.—
Colour: black.
Sales of exchange on form
2991–2994, applied at the
type of 18.00 pesos currency:
dollars.—N. 444, February
16th, 1956.

Name of the Institution: City.—
N. 05.—Interim allottment:
32.500.00.
Total currency to be negotiated:
32.500.00.
Exporter and Issuer of
Documents: Compañía Swift
de La Plata, S.A."

It is noted that the Application for Shipment is a document precedent to the Shipping Document, or Loading Permit, which officially permitted the lading of this merchandise.

Mr. Skidmore's affidavit states that, according to Argentine Central Bank regulations, all official market exports from the Argentine are made against prepayment or against an irrevocable letter of credit, and that the Swift shipments of canned meat to the United States were made against a revolving irrevocable letter of credit. Mr. Skidmore's affidavit is quoted earlier in this opinion, but that portion of the affidavit which relates to the letter of credit procedure is considered again at this point.

Mr. Skidmore states that Swift was obliged to go to the bank through which the letter of credit had been opened, in order to obtain certification by that bank on the Solicitud de Embarque (Application to Ship) to the effect that the letter of credit had been received. At that time, the bank issued, as proof that exchange had been covered *prior to shipment,* an exchange cover form 2991, N. 4441 (Specimen 6) which shows both the total exchange and the rate. This exchange cover, Mr. Skidmore states, was delivered to the customs authorities, together with the Application to Ship and the Shipping Document, or Loading Permit.

Circular C. 2312, issued by the Central Bank of the Argentine Republic under date of October 28, 1955 (attached to Specimen 6), details instructions for the *liquidation of the retentions.* Both in this circular, and in Mr. Skidmore's affidavit, it is stated that such liquidations are required to be made and reported

*daily.* Foreign exchange balances are established *daily.*

Defendant's position appears to rest, in some part, on confusion between the date of liquidation of the retentions and the date of advice of liquidation of the shipping documents. The dollars for this merchandise were converted into Argentine pesos, according to the evidence of record, on February 16, 1956, which is 28 days prior to March 16, 1956, the date when liquidation of the documents was advised. The First National City Bank charged interest for this period of 28 days on $32,500 paid for this merchandise. It will be recalled that the letter of credit in this transaction was both irrevocable and revolving; and that it was already in the hands of First National City Bank, Buenos Aires branch, on February 16, 1956, when that bank certified on the Application to Ship (Specimen 3) that *it had sold exchange that day* at the "type" of 18 pesos and made allotment of $32,500.

It may be noted, also, that the elapsed interest period between February 16, 1956, and March 16, 1956, is 28 days, the precise period for which interest was charged.

Whether the retention charge was actually paid by First National City Bank to the Central Bank of Argentina on February 16, 1956, as the daily settlement procedure required, is not categorically stated of record. However, it is clear that this was required, since First National City Bank sold United States dollars in Buenos Aires for Argentine pesos at the controlled rate on that date. By regulation, it had to make daily settlement of foreign exchange transactions, including payment of the retention. Moreover, as earlier noted, First National City Bank collected interest on the basis of a payment made February 16, 1956.

This case illustrates some of the problems which this court often encounters, when litigation before it requires construction of foreign laws and their operation in relation to the exportation of goods to the United States. Especially where, as here, the law and the official documents in original text are in another language, and are of evidence in English translation, the opportunities for confusion, contradiction, and misunderstanding are considerable. In such a case, it is important to resolve any conflicts that may appear as to foreign law, as we would resolve them here, that is, according to the legislative intent.

The intent here was declared. It was to control foreign exchange by means, *inter alia,* of controls over certain imports and exports. Control over export of canned corned beef by an Argentinian seller was not disassociated from control over the manner of payment for that merchandise by the United States purchaser, or the currency in which payment for the merchandise was to be made, or the rate of foreign exchange applicable to the transaction, or the Government charges exacted. These are all part of one program. This the record before me shows.

Sale of dollars for pesos and settlement of the foreign exchange with the concomitant retention charge of 15 per centum, were necessary prerequisites to obtaining the permit to lade this merchandise. The record sufficiently indicates that all this was done.

This merchandise was sold f.o.b. Buenos Aires. The retention charge was laid on the full f.o.b. Buenos Aires value. It is a charge *after* the merchandise was packed ready for shipment to the United States. United States v. International Commercial Co., Inc., supra. It is *not* a charge after delivery in the United States, as United States internal tax would be. It is one of the costs in the Argentine of getting this merchandise exported from Argentina and, hence, is a necessary expense from the place of shipment to the place of delivery.

There remains to be considered the rate of exchange that is to be used in converting Argentine pesos into currency of the United States, in order to

determine the value of certain deductions from United States selling price, allowable in the computation of United States value. This is the second of the issues raised in plaintiff's appeal.

It has been stipulated that, for the quarter-year in which this merchandise was exported, the value for conversion had not been proclaimed by the Secretary of the Treasury, under section 522(b) of the Tariff Act of 1930. Therefore, conversion is to be made at buying rate, under the provisions of section 522(c) of the Tariff Act of 1930. 31 U.S.C.A. § 372(c).

Section 522(c) provides for conversion at a value measured by the buying rate in the New York market on the day of exportation. Such buying rate may be stated more specifically as the buying rate for cable transfers payable in Argentine currency, as determined by the Federal Reserve Bank of New York and certified by the bank daily to the Secretary of the Treasury.

Probably because of the new controls that were imposed by the Argentine Government in late October 1955 (referred to previously), the Federal Reserve Bank of New York temporarily omitted the value of Argentine pesos from its daily certification. This omission began October 28, 1955. T.D. 53938. On April 18, 1956, an advisory to collectors of customs was issued by the Assistant Commissioner of Customs (T.D. 54070), which was devoted exclusively to the conversion value of Argentine pesos. For the period October 28, 1955, to April 12, 1956, inclusive, during which daily certification by the Federal Reserve Bank of New York was omitted, the Assistant Commissioner advised that the Federal Reserve Bank of New York had now certified two rates, one designated as "Official" and the other designated as "Free." For this entire period, the certified official rate was $0.0555555 per peso, which is a rate of 18 pesos per dollar. For February 23, 1956, the date of exportation of this merchandise from the Argentine, the certified free rate was $0.0236852 per peso, which is a rate of 42.2 pesos per dollar.

The rate of 15.3 pesos per dollar which the appraiser used for conversion is, therefore, neither of the two rates certified for the day of exportation. The court does not assume that the appraiser acted unlawfully or irrationally in converting certain allowable deductions at this rate. Indeed, if the appraiser had credible information that a type of rate or combination of types of rates not applicable to payment for the merchandise was required or permitted in payment of costs, charges, or expenses, separate conversion of deductions is directed. Section 16.4(e)(5), Customs Regulations. "In deducting non-dutiable costs, charges, or expenses, the foreign exchange shall be at the rate or rates actually used in payment of such costs, charges, or expenses, whether or not certified by the Federal Reserve Bank." Section 16.4 (e)(5), idem.

The record before me shows that the rate actually used in payment of the Argentine retention was the official rate certified by the Federal Reserve Bank of New York. The record does not show the rate or rates actually used in payment of the other nondutiable charges, so called. The appraiser, if he acted properly (and I must assume that he did), evidently had information which he deemed credible, to the effect that some type of rate or combination of types of rate was required or permitted in payment of these nondutiable charges. There is no evidence before me to overcome the presumption that, as to these charges, the rate actually used in payment was in fact the rate of 15.3 pesos to the dollar, as the appraiser has found.

Section 16.4(e)(5) applies the rule laid down by the United States Supreme Court in Barr v. United States, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765, namely, that it is the actual buying rate in a transaction which is to be used.

Neither party has offered in evidence anything to throw light on the actual exchange rate or rates used in payment of these nondutiable costs, charges, and ex-

penses, save only as to the rate that was actually used in payment of the 15 per centum Argentine retention. On this record, the rate of 15.3 pesos per dollar used by the appraiser is presumed to be correct and will stand, as to the miscellaneous nondutiable charges aggregating $0.3166 per unit; the rate of 18 pesos per dollar is found to be the rate actually used to pay the retention, and the value of the retention will be converted at that rate.

The parties have stipulated two alternative computations of United States value. These are illustrative only, and are useful in the event that the court makes, as an entirety, the findings of fact and of law for which one or the other opponent contends. The court is not restricted to such findings. When, on the record as developed, the court finds, a value which is not reflected in either computation, the stipulated alternatives are inapplicable. That is the situation here.

The following tabulation reflects the appraised value of this merchandise in accordance with this opinion:

Per doz. tins, 12 oz. net pkd.

| | | |
|---|---|---|
| U. S. Selling Price | | $5.05 |
| Less 1% Cash Disc | | .0505 |
| | | |
| U.S.S.P. Net | | 4.9995 |
| *Deductions* | | |
| Ocean Frt | .1542 | |
| Insurance | .0075 | |
| Gen'l Exp. 8% | .4000 | |
| Profit 8% | .4000 | |
| Nondutiable Charges | .3166 | (Calculated at 15.3 pesos per U. S. dollar) |
| 15% Retention | .4875 | (Calculated at 18 pesos per U. S. dollar) |
| Duty at 20% | .53895 | 2.30475 |
| | | $2.69475 |

———◆———

The appeal to reappraisement having been abandoned as to all merchandise of the entry save only that merchandise which is described as canned corned beef, and there being no evidence to overcome the presumption that the appraiser's action with respect to such other merchandise was correct, the appraised value is sustained as to all of the entry merchandise, except the canned corned beef.

I find as facts:

1. That the merchandise of this appeal is first-grade canned corn beef, packed in cases of 24 tins, 12 ounces each, which was exported from Argentina on February 23, 1956, and entered at the port of New York.

2. That at the time of exportation of this merchandise, such or similar merchandise was not freely offered in the principal markets of Argentina in the

usual wholesale quantities and in the ordinary course of trade for sale to all purchasers, either for consumption in Argentina or for exportation to the United States.

3. That at the time of exportation of this merchandise, such merchandise was freely offered for sale in the principal market of the United States to all purchasers, in the usual wholesale quantities and in the ordinary course of trade, and the price at which such merchandise was so offered, packed ready for delivery, was $5.05 per dozen tins, 12 ounces, net packed, less 1 per centum cash discount, or a net price of $4.9995 per dozen tins, 12 ounces, net packed.

4. That on or about October 27, 1955, prior to the exportation of this merchandise on February 23, 1956, and effective on the date of such exportation, the Argentine Government had established controls over the exportation from Argentina of certain merchandise, including this merchandise, and in connection with and as a part of such controls required that 15 per centum of the full f.o.b. price of this merchandise be retained, or withheld, from the seller of the merchandise and that such retention be paid to the Central Bank of Argentina for the National Economic Reestablishment (or Recovery) Fund of the Argentine Government.

5. That in order to make effective such controls over exports and to assure payment of the retention, the Argentine Government established a procedure by which, and only by which, controlled merchandise could be exported from Argentina; that this procedure included official authorization of the transaction of sale and export, as a first step, then an application to ship the merchandise, and thereafter shipment of the merchandise pursuant to an official shipping license, or permit; that prior to official issuance of the shipping license, or permit, it was required that the merchandise either be prepaid in United States currency sold for Argentine pesos at a controlled rate of exchange decreed by the Argentine Government or, alterna-

tively, that payment be made through an irrevocable letter of credit on file with a bank, duly licensed by the Central Bank of Argentina under the control program, and that, in either case, the retention of 15 per centum of the proceeds of sale be paid to the National Economic Reestablishment (Recovery) Fund and not paid to the seller.

6. That the required procedure was followed with respect to the exportation of this merchandise; the buyer paid for the merchandise through the First National City Bank of New York, Buenos Aires branch; and on February 16, 1956, prior to exportation on February 23, 1956, said bank certified that $32,500 in United States dollars, the price of this merchandise, had been sold for Argentine pesos at the official rate of 18 pesos per dollar, and that 15 per centum thereof would be retained, as required, for the Argentine Government; and that, thereafter, the necessary license to ship this merchandise to New York was issued by Argentine officials.

7. That in computing United States value of the merchandise, the appraiser disallowed deduction of this Argentine retention, which plaintiff claimed is a necessary expense from the place of shipment in the Argentine to the place of delivery in the United States; that this retention of 15 per centum was such a necessary expense and was paid out of the proceeds of United States currency that had been converted into Argentine currency at the rate of 18 pesos to the dollar.

8. That for February 23, 1956, the day of exportation of this merchandise from Argentina, the Federal Reserve Bank of New York certified two buying rates for Argentine pesos; one, denominated the official rate, was certified as $0.0555555 per peso, equivalent to 18 pesos per dollar; and the other, denominated the free rate, was certified as $0.0236852 per peso, equivalent to 42.2 pesos per dollar.

9. That certain charges, costs, and expenses of a nondutiable character, deduction of which is not disputed, were

converted by the appraiser at a rate of 15.3 pesos per dollar; and there is no evidence of record as to what the actual buying rate was with respect to these charges, costs, and expenses which, as so converted by the appraiser, aggregate the sum of $0.3166 per appraised unit of this merchandise.

10. That allowances for ocean freight, insurance, general expense, and profit, aggregate $0.9617 per appraised unit of this merchandise, which the appraiser allowed.

I conclude as a matter of law:

1. That at the time of exportation there was no foreign value or export value for the canned corned beef, subject of this appeal, as such values are defined in section 402 of the Tariff Act of 1930, as amended.

2. That United States value, as defined in section 402(e) of the Tariff Act of 1930, as amended, is the basis of value for appraisement of such merchandise.

3. That the invoice item "Exchange Retention, 15%" is a necessary expense from place of shipment to place of delivery, and, as such, is allowable as a deduction from United States selling price in order to compute United States value of the merchandise.

4. That the value of this retention deduction is convertible from Argentine currency into United States currency at the official rate of 18 pesos per dollar, which is actual buying rate.

5. That the deductions allowable in appraisement for loading permit, stamp on bill of lading, Argentine statistical charges, exchange stamp tax, export sales tax, lucrative activities tax, lighterage charge, and placing on board charge are convertible from Argentine currency into United States currency at the rate of 15.3 pesos per dollar used by the appraiser; there being no evidence as to actual buying rate and, therefore, the presumption of correctness of the appraiser's action with respect to these transactions has not been overcome.

6. That the United States value of the entry canned corned beef is $2.69475 per dozen tins, 12 ounces, net packed.

7. That the value of entry merchandise other than canned corned beef is the appraised value.

Judgment will be entered accordingly.