56 CCPA

The **UNITED STATES**, Appellant,

v.

**CAVALIER SHIPPING CO., Inc.,** Soderhamn Machine Manufacturing Co., Appellees.

**Customs Appeal No. 5310.**

United States Court of Customs and Patent Appeals.

July 24, 1969.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Andrew P. Vance, New York City, Chief, Customs Section, Brian S. Goldstein, New York City, for the United States.

Sharretts, Paley, Carter & Blauvelt, New York City, for appellees; Eugene F. Blauvelt, New York City, of counsel.

Before RICH, Acting Chief Judge, NICHOLS, and NEESE, Judges, sitting by designation, ALMOND and BALDWIN, Associate Judges.

BALDWIN, Judge.

This is an appeal from the judgment of the Third Division, Appellate Term, of the United States Customs Court[1] affirming the trial court's judgment in favor of the importer in two consolidated appeals for reappraisement of importations of incomplete debarking machines from Sweden.[2]

The first appeal, R61/12950, covers six Cambio 35 debarking machines imported in 1956 and the other, R61/12951, involves two Cambio 66 machines imported in 1959. The 1956 importations were appraised under section 402(f), cost of production, Tariff Act of 1930 and the 1959 importations were appraised under section 402(d), constructed value, Tariff Act of 1930 as amended by the Customs Simplification Act of

1. Reported at 59 Cust.Ct. 850, A.R.D. 229.

2. Reported at 57 Cust.Ct. 652, R.D. 11231.

1956, Public Law 297, 84th Congress, 91 Treas.Dec. 295, T.D. 54165. The sole dispute lies in whether certain additional sums representing a royalty for each machine added to the declared values by the appraiser were proper, since the statutory basis of appraisement is not in issue and the other components of the appraised values are unquestioned.

The pertinent portions of the involved statutes read:

Section 402, Tariff Act of 1930:

(f) COST OF PRODUCTION.— For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expense (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or produc- tion who are engaged in the production or manufacture of merchandise of the same class or kind.

Section 402, as amended, supra:

(d) CONSTRUCTED VALUE.— For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount of general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

The imported machines were manufactured in and exported from Sweden in an incomplete condition by Soderhamns Verkstader A.B. of Soderhamn, Sweden and imported by Soderhamn Machine Manufacturing Company, a United States subsidiary in which Soderhamns Verkstader owned the controlling interest. The importing firm complet-

ed manufacture of the machines by adding two electric motors and certain other parts manufactured according to American specifications and then sold them in the domestic market.

The royalties in question arise from certain patent agreements of April 28, 1955 between the Swedish manufacturer and three Swedish inventors named Andersson, Brundell, and Jonsson. One, the "Cambio" agreement,[3] involving all three inventors, related to rights to inventions resulting in the Cambio debarkers and patent applications pertaining thereto. A "Development" agreement, involving Brundell and Jonsson, related to future improvements and new designs for debarkers. The Customs Court analyzed the agreements as follows:

The effect of these April 28, 1955 agreements, out of which the present controversy arises, was the acquisition by Soderhamns Verkstader of all rights of the inventors to the Cambio debarking machines and to patents thereon, the right to the technical assistance of the three inventors of the Cambio debarkers in the exploitation of the Cambio inventions without additional remuneration, and the right to procure from inventors Brundell and Jonsson future improvements and new designs for debarkers. As consideration the inventors Andersson, Brundell, and Jonsson, and inventors Brundell and Jonsson were entitled to receive from Soderhamns Verkstader royalties of 15 and 5 percent respectively of ex-factory invoice prices of Cambio debarkers manufactured and sold by Soderhamns Verkstader and the subsidiary company Soderhamn Machine. In the case of sales from the latter, "the royalty shall be calculated not on the basis of the subsidiary company's net invoice value but the company's own net invoice value for a corresponding number of machines sold in a corresponding period to buyers in Sweden," and, under the "Cambio" agreement, the inventors are guaranteed minimum annual royalties of 105,000 Swedish crowns.

The debarking machines covered by R61/12950 were exported at a time when the agreements of April 28, 1955, were in effect as originally executed. However, prior to the exportation of the debarking machines covered by R61/12951, the "Development" agreement, which was a year to year contract terminable on 6 months notice, was terminated, effective January 1, 1959; and the "Cambio" agreement, which was terminable on 24 months notice, had been modified to the extent of the formulae it contained for the ascertainment of royalty amounts and royalty rates. Under the terms of the original "Cambio" agreement a royalty of 15 percent was computable, as to the parent company's home market sales and export sales to countries other than the United States, on the basis of net invoice values of such sales. And as to sales of incomplete "Cambio" debarkers made to the subsidiary United States company, the royalty payable under said agreement was computable on the basis of the net invoice values of a comparable number of contemporary sales of complete machines made in the home market by the parent company. However, under the *modification* of said agreement the royalty

---

3. A copy of this agreement is attached to the importer's Exhibit 1 and refers to "barking machines for which some patents have been granted and others applied for in accordance with Appendix A" but Appendix A is omitted and the record thus does not identify the patents and applications covered. However, it seems clear that the agreement involved at least Swedish patents since it states that it "shall remain in force as long as the Company [Soderhamns Verkstader] holds any valid Swedish patent which is subject to this agreement and which protects significant parts of the design of the debarking machine covered by this agreement." Also, counsel for the government stated at oral hearing, without contradiction by the importer's counsel, that the agreement involved Swedish patents covering the machines.

payable on account of "Cambio" debarkers sold to the subsidiary company was computable on the basis of 6 percent of the net invoice values of the subsidiary's resales of such machines, effective October 1, 1958. And the rate for computation of royalties based on the parent company's sales was, under the *modification,* reduced to 12 percent of the net invoice values of such sales, effective January 1, 1959. The modification also provided for the reimbursement by the parent company to the three inventors of annual outlays or expenses which they would incur in the course of the work to which they were committed, within a maximum annual amount to be fixed at the beginning of each year—the sum of 50,000 Swedish crowns being the amount fixed for such purpose for the year 1959. Such were the changes which had taken place when the debarking machines the subject of R61/12951 were exported.

The record shows that the Swedish manufacturer charged the royalties on the imported machines to the importer Soderhamn Machine Company and billed it for payment of the same although such charges were not reflected in the invoices for the shipments. A royalty account was maintained on the books of the importer indicating the invoice and serial numbers of the imported machines. The accounts show for six machines bearing serial numbers 58836 through 58841, covered by R61/12950, a charge of $8,689.22 which amounts to $1,448.20 per machine, the sum added by the appraiser to each unit invoice price for such machines. For machines corresponding to serial numbers 60505 and 60506, covered by R61/12951, the accounts show charges of $1,648.86 and $1,479.00, respectively, and those are the amounts added by the appraiser for those machines.

At the time of the 1956 importation it was the practice of the parent Swedish company to notify the importer of the amount to be entered as a liability to the inventor and the importer's attorney conceded that the amounts so designated by the Swedish company were arrived at by conforming to the provisions of the royalty agreements the latter company had with the inventors. It was observed by the trial court that the president of the importer stated that it was not the intent to pay this amount immediately but only when the importer could afford to do so.

In holding that the royalty was not part of either the cost of production or constructed value of the importations, the trial court relied on R. J. Saunders & Co., Inc. v. United States, 23 Cust. Ct. 311, Reap.Dec. 7754 (1949), and stated:

> In the instant case, incomplete machines are imported and completed in the United States. The royalty was not payable until the sale of the completed machines. * * *

In affirming, the Customs Court likewise relied on the *Saunders* case. There the importations, appraised at cost of production, were unbound printed sheets which were converted into bound books after importation and sold at retail for a price which included a royalty to the author. The court there referred to evidence that "the charge for royalties is a charge that is made on the retail sales of the bound books and that this charge is never made on the unbound sheets as imported." It further held that "no royalty in any form" attached to the "unbound printed sheets" and that no royalty was ever due and payable or collected "until these unbound sheets had been converted into books and sold at retail."

In reaching its conclusion in the present case, the Customs Court stated:

> The value of a royalty is determined by taking the royalty charge ordinarily payable, after sale, for like merchandise. A completed machine sold in Sweden and an incomplete machine exported to the United States are not like merchandise. A royalty based on a percentage of a net invoice amount arrived at by deducting the

manufacturing costs of a completed machine sold in Sweden cannot be equated to the net invoice amount realized on merchandise exported to the United States in an incomplete condition and completed and sold in the United States, and would not be a reliable means of determining the value of the incompleted goods imported into the United States. Thus a royalty on the sale price of a complete machine sold in Sweden can have no bearing upon the cost of production of an incomplete machine exported to the United States. Also, a royalty of 6 percent of the United States sale price of the machine completed in the United States has no bearing on the constructed value of the incomplete machine. Following the reasoning in the *Saunders* case we are of the opinion that the royalty is not a part of either the cost of production or constructed value of the imported incomplete machines, and we find no reversible error in the decision of the trial court.

■ Assuming *arguendo* that the *Saunders* case correctly states the law, we nevertheless think the Customs Court erred as a matter of law in finding it controlling here. No liability for royalty was found to attach in *Saunders* until the completed books were sold. Here, the agreements between the manufacturer and the inventors gave rise to a liability of the former to pay the royalties, and there is no substantial evidence to show that such liability did not attach *to the manufacturer* until and unless the machines were completed and sold by the importer. The apparent agreement of the manufacturer with the importer that the latter did not have to pay immediately may have determined the time that the *importer* incurred the liability but that has not been shown to have affected the liability of the *manufacturing exporter* under its agreements with the inventors. It is, of course, the expenses of the *manufacturer* that figure in the determination of cost of production and constructed value.

We find no legal support for the Customs Court's judgment in the fact that the royalty due the inventors was based on the invoice amounts in connection with completed machines sold in Sweden. This factor relates only to the basis for calculation of the royalty on the machines exported to the United States and the royalty determined in that manner is actually applicable and thus directly related to the costs of producing the exported machines to which it is applied. Likewise, determination of the amount of royalty liability already incurred by the Swedish manufacturer on the basis of a percentage of the sale price of the completed machines in the United States no more excludes that royalty from being an expense incurred in the manufacture of the machines exported than would some other more direct or obvious mode of calculation.[4]

It further appears that the trial judge in Saunders recognized a distinction between that case and a case like the present one. Thus, he stated:

> * * * I am frank to admit that if it were established by the evidence before me that the royalties in the case were a part of the cost of producing the merchandise as imported, I would unhesitatingly hold such royalties to be a part of the cost of production of the imported merchandise.

In the present case the appraiser undoubtedly regarded the royalties here to be part of the expense of producing the imported merchandise.

The trial court cited several other decisions as also "holding certain royalty and license fees not to be part of

---

4. It is recognized that determination of the amount of the royalty on the basis of sales price in the United States might present some practical problems where there was a long delay in selling the importations but that fact is not shown to be material to the question whether the royalty is an expense incurred in the manufacture.

cost of production or constructed value," but it did not specifically rely on them and we consider them inapposite here. In particular, we do not regard any of them as authority for holding that the *importer's* right to defer its payment of royalty here prevents the contractual obligation of the Swedish *manufacturer* from being an element of its expenses. One of those cases, United States v. Hensel, Bruckmann & Lorbacher, Inc., 39 CCPA 86, C.A.D. 486 (1951), held a license fee paid to the foreign holder of a United States patent by an importer *was paid in consideration of the exclusive right to purchase the involved machines for export to the United States* and therefore not an element of cost of production. Obviously, the importer here has not brought its case within that rationale.

Finally, a party attacking an appraised value has the burden of proving such value is incorrect and the asserted value is correct. Hill-Brown Corp. v. United States, 54 CCPA 99, C.A.D. 917 (1967). Here, we think the Customs Court erred in law in holding that the present case falls within the legal principle that governed in *Saunders*. Although the record is not completely clear as to whether royalty on the importations were actually paid by the *importer*, we do not think there is any finding, or substantial basis for a finding, that the *manufacturer* was not obligated to pay the royalties to the inventors. On the present record, therefore, the royalties in question must be considered part of the usual general expense under cost of production or part of an amount of general expenses under constructed value under the respective involved statutes.[5]

The judgment of the Customs Court is reversed.

Reversed.

NEESE, J., concurs in the result.

5. In United States v. Alfred Dunhill of London, Inc., 32 CCPA 187, C.A.D. 305 (1945), this court stated that it regarded the "usual general expenses" to be "the expenses of doing business" and to include, in addition to the more obvious items such as salaries, wages and commissions, costs of delivery and depreciation, "other actual outlays."