**GOODRICH–GULF CHEMICALS, INC.**

v.

**UNITED STATES.**

R.D. 11733; Reappraisement
No. R64/7286.

United States Customs Court.

Feb. 2, 1971.

Barnes, Richardson & Colburn, New York City (Norman C. Schwartz and David Elliott, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Arthur E. Schwimmer, Los Angeles, Cal., Brian Goldstein, Andrew P. Vance, New York City, and Joseph I. Liebman, Dept. of Justice, Customs Section, New York City, trial attorneys), for defendant.

ROSENSTEIN, Judge:

This is an appeal for the reappraisement of a spiral flight dryer apparatus exported from West Germany on or about October 7, 1960, which was manufactured and sold by the West German firm of Ruhrchemie A. G. and imported by Goodrich-Gulf Chemicals, Inc., the purchaser. The merchandise was appraised under constructed value, section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at DM1,503,423.28, with an allowance for motors of United States manufacture, as American goods returned.

The parties stipulated that the construction, sale and shipment of the merchandise were governed by an agreement, dated December 18, 1959, between Ruhrchemie A.G. and plaintiff (exhibit 1), and that the appraised value includes various costs incurred by Ruhrchemie in testing the merchandise in accordance with Article VI of the agreement.

■ Plaintiff does not challenge the basis of appraisement herein, but raises the question whether the costs of testing, or any part thereof, were properly included in the constructed value of the merchandise. Plaintiff contends that the gross reimbursable cost of testing totals DM466,626.89 (the direct testing cost of DM314,821.55 plus the administrative markup of DM151,805.34 added by the manufacturer), and that the "net" reimbursable cost of testing is this amount less DM37,152.90 which represents the

final agreed upon "salvage value" of certain testing materials retained by Ruhrchemie and which, under the terms of the agreement, would be used to offset Ruhrchemie's reimbursable testing costs.

Section 402(d), Tariff Act of 1930, as amended, *supra*, reads as follows:

(d) Constructed value.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; [1] and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

The record consists of the aforementioned stipulation and of documentary exhibits submitted by both parties.

1. Government counsel stated at the hearing that the cost of testing was allocated between subsections (d)(1) and (d) (2), but he could not furnish a breakdown of the cost.

Article I of the basic contract governing the transaction (exhibit 1) sets forth the specifications and a general description of the merchandise, and includes a provision that—

RUHRCHEMIE will assemble part of the equipment they are providing GOODRICH-GULF in order to make test runs in their plant on actual product, and to demonstrate the required performance.

Article II sets out the method for "determining the total reimbursable costs GOODRICH-GULF has to pay as a price for the complete SPIRAL DRYER PLANT supplied by RUHRCHEMIE."[2] It provides that the "exact Pieces of Equipment Retained by RUHRCHEMIE and their respective Value will be mutually agreed upon by RUHRCHEMIE and GOODRICH-GULF at the End of the Test Program."

Article III covers methods of payment; and Article IV, which covers "RECORDS, AUDITS, AND INSPECTIONS", provides that—

2. RUHRCHEMIE shall afford GOODRICH-GULF to a reasonable extent the possibility to follow the performance of the WORK and permit to that effect the Engineers of GOODRICH-GULF and its authorized representatives access to the WORK, especially allowing them to be present when the Testings of the Testing Apparatus are carried out. RUHRCHEMIE shall furnish GOODRICH-

GULF the information required in connection with the WORK.

Article V sets forth the various guarantees made by the manufacturer.

Article VI details the completion, testing and acceptance of the work, as follows:

The dryer systems of RUHRCHEMIE'S design have never been constructed or tested at the capacity required for GOODRICH-GULF'S poly-

ethylene plant. RUHRCHEMIE does not guarantee the yields of this plant as stated in Article I, but based on its experience feels they can be attained, and is willing to extend its work to obtain these yields. Therefore, satisfactory operation of the equipment must be demonstrated by installing and testing drying facilities at RUHRCHEMIE'S plant. * * * GOODRICH-GULF reserves the right to have its engineers or its duly authorized representatives observe these tests and to decide whether further testing is required and, if so, under what conditions the retesting will be done. * * * GOODRICH-GULF shall reserve the right to either accept or reject the WORK. * * *

After completion of the test work, GOODRICH-GULF shall notify RUHRCHEMIE by cable and registered mail that they either accept the WORK or that they do not accept the WORK and state specific reasons for such nonacceptance. In the event of such nonacceptance, RUHRCHEMIE agrees to perform such additional work as shall be necessary to complete the WORK upon the approval of GOODRICH-GULF. After such reworking RUHRCHEMIE shall repeat the test and GOODRICH-GULF will again witness such tests and notify RUHRCHEMIE of either its acceptance or nonacceptance of the WORK. The cost of such additional reworking shall be considered as part of the WORK hereunder and RUHRCHEMIE will be reimbursed for any cost incurred in following GOODRICH-GULF'S request and in accordance with ARTICLE II "Formula for Determining Net and Total Reimbursable Cost to RUHRCHEMIE" unless subject to provisions of Article V, such additional work is required to correct defective construction work already performed by RUHRCHEMIE, in which latter case the cost of such

2. Materials, for example, that enter into the apparatus for the testing plant are to be calculated at "Ruhrchemie's cost plus 15%"; salaries and hourly wages for car-

rying out testing in the testing apparatus are at "Ruhrchemie's direct cost plus 80% for General Expenses."

additional work shall be at RUHR-CHEMIE'S sole expense.

Exhibit 2, an affidavit of Rudolph Blank, dated November 13, 1967, states that he is a "procurist" for Ruhrchemie; that he is, by virtue of his duties, familiar with the circumstances surrounding the acquisition, assembly and sale of the dryer plant, and that—

* * * these systems were the largest of their type that Ruhrchemie had ever designed and until they had been assembled and tested, it was not known whether they would perform in accordance with their designed capacities. Therefore, as part of its obligation under the agreement, Ruhrchemie agreed in Article VI, Page 7, also Page 2c, to assemble and test these systems in Germany in the presence, and to the satisfaction, of Goodrich-Gulf's engineers before disassembling and shipping them to the United States. In order to test the completed systems, it was necessary to construct rather extensive foundations of brick and masonry, and to connect the various components by a temporary but complete installation of duct work, piping, supplementary blowers, controls, heaters, pumps, instrumentation and other similar auxiliary equipment. To adequately test the systems, it was necessary to manufacture amounts of polyethylene to determine if the equipment would actually produce material to Goodrich-Gulf's specifications. It was understood between Ruhrchemie and Goodrich-Gulf that said auxiliary equipment was to be retained by Ruhrchemie after completion of the testing program, and that its salvage value would be used to offset Ruhrchemie's reimbursable costs of testing as defined in the agreement, Article II, Pages 3, 3a and 3b. The final salvage value agreed upon was DM37,152.90. Exhibit A attached to this affidavit represents a complete itemization of the retained auxiliary equipment and its salvage value.[3] None of such auxiliary equipment was included in the equipment shipped to the United States, Goodrich-Gulf intending to provide similar auxiliary equipment of the systems in its polyethylene plant.

With regard to the testing program undertaken by Ruhrchemie under contract, Blank states that it was—

* * * a highly unusual arrangement. In the course of manufacture of standard industrial chemical machinery the manufacturer utilizes commonly-accepted testing procedures, to insure that merchandise sold to purchasers is adequate in design and performance. However, since these dryers were *non-standard items*, the testing program for Goodrich-Gulf was of an entirely different nature than usual and ordinary testing procedures, involving, as it did, the complete assembly in Germany before shipment of the entire apparatus, the installation of auxiliary testing equipment, and the dismantling of the apparatus after completion of testing, for shipment to Goodrich-Gulf after salvaging the auxiliary equipment. A testing program such as heretofore described is almost always carried out after delivery of the equipment to the purchaser and installation at the purchaser's factory. However, *due to the unusual size of these systems* and the necessity that they meet the performance guarantees, it was concluded to test them first in Germany before shipment to the United States and installation in Goodrich-Gulf's polyethylene plant. I am generally familiar with the practices of West German manufacturers of industrial chemical machinery of the same class or kind, through my experience in this area, which started in 1955 and my frequent contacts with other members of the trade. In my opinion, and with reference to the West German industrial

---

3. Exhibit B, attached to the affidavit, is a schedule of costs and expenses incurred under the contract. It shows the gross cost of testing to be DM466,626.89 with an allowance of DM37,152.90 for salvage, leaving DM429,473.99 as the net reimbursable cost of testing.

chemical machinery trade as a whole, the above-described testing program for Goodrich-Gulf, of such an elaborate nature carried out before delivery to the purchaser was typical of that used in experimental research and development work. Such a testing program was entirely different from the testing of equipment sold in ordinary transactions. [Emphasis supplied.]

In a second affidavit, dated March 18, 1968 (exhibit 3), Blank states that he worked quite closely with the engineer responsible for the project; that he extensively reviewed construction plans, parts lists and similar documents; that such work was necessary at the time the project was completed in connection with German tax and customs questions; that he was responsible for preparation of the final invoicing to Goodrich-Gulf; and that exhibit B of exhibit 2 was prepared by two former directors of Ruhrchemie, one of whom was technical director and supervisor of the technical work on the imported equipment, the other of whom was head of the sales department.

An affidavit of Johann Hoeffler, dated March 18, 1968 (exhibit 4), states that he is personally in charge of the maintenance of all bookkeeping records of the company; that he was responsible for computing the cost of the spiral drying equipment; that he personally worked on the various cost analyses forwarded by Ruhrchemie to Goodrich-Gulf; and that, in his official capacity as assistant head of the bookkeeping department, he certifies the accuracy of the cost information contained in exhibit 2. Hoeffler also set forth the various costs for testing which, exclusive of overhead, totaled DM263,106.24, and the operating (factory) and administrative costs, which totaled DM109,104.03.

Exhibit A, a Treasury Agent's report dated November 14, 1962, summarizes the agreement between the parties, and indicates that, when tested, certain items required installation of different filter fittings or brackets; that some items were found to require "minor but essential changes"; and that others required heavier springs and compact gaskets.

Collective exhibit B is a letter, together with attachments, from the general counsel for Goodrich-Gulf to the acting examiner at the port of Beaumont, Texas. The first attachment contains answers to questions posed by the New Orleans appraiser of merchandise regarding the subject entry. It includes the statement that the "pilot plant work" by Ruhrchemie was done prior to the December 18, 1959 agreement, and that the only "testing" done under the 1959 agreement was "to determine whether the Equipment purchased by Goodrich-Gulf was itself adequate."

On this record, plaintiff asserts that the testing cost is the "net" cost remaining after deduction of the agreed salvage value of equipment retained by the manufacturer, and that such cost is an "unusual and extraordinary type of expense" and one "which accrued *after* completion of manufacture" [emphasis quoted], thereby forming no part of constructed value. I do not agree.

The constructed value and cost of production formulas are designed, under their respective statutes, to embrace all expenses of manufacture or fabrication of an article, whether borne by the manufacturer or purchaser. United States v. Cavalier Shipping Co., 56 CCPA 117, C.A.D. 965, 412 F.2d 245 (1969); Border Brokerage Co., Inc. v. United States, 65 Cust.Ct. ——, R.D. 11725 (1970), application for review pending; Ford Motor Company v. United States, 29 Cust.Ct. 553, A.R.D. 9 (1952); Ravenna Mosaics (Inc.) v. United States, 49 Treas.Dec. 699, T.D. 41503 (1926).

Consistent with the foregoing principle, it has been held that the costs of designs, patterns, blueprints and molds which are used in the making of articles are part of the cost of production thereof within the meaning of the tariff statutes. Lionel Trading Co., Inc. v. United States, 24 CCPA 432, T.D. 48900 (1937); Troy Textiles, Inc. v. United States, 64 Cust.Ct. 654, R.D. 11697 (1970); Fergus Imported Cars, Inc. v. United States, 52 Cust.Ct. 437, R.D. 10675 (1964); Ford Motor Company v. United States, *supra;* Carey & Skinner, Inc. v. United States,

3 Cust.Ct. 600, R.D. 4663 (1939); Ravenna Mosaics (Inc.) v. United States, *supra*. And the research, design and development costs of two test models produced in Canada were recently held to be properly a part of statutory cost of production, although the costs were not assumed by the manufacturer and were the subject of a separate contract.[4] Border Brokerage Co., Inc. v. United States, *supra*.

Constructed value has also been held to include, not only the cost of manufacturing certain standard equipment (oxygen converters), but the fees paid the manufacturer under a separate contract for engineering revisions made in the equipment itself. The H. K. Ferguson Company v. United States, 59 Cust.Ct. 770, R.D. 11409 (1967). The court stated therein:

> An engineering revision of standard equipment is a fabrication or process of producing the equipment as much as is fabricating the basic standard equipment. And the cost of engineering the revision is part of the overall cost of fabrication. In Ford Motor Company v. United States, 29 Cust. Ct. 553, A.R.D. 9, the second division, appellate term, held that pattern equipment of American manufacture, used in the production of imported rough iron castings, is an essential item of the cost of "fabrication, manipulation, or other process employed in manufacturing or producing" merchandise under the old cost of production valuation basis since "[i]ts purpose is to derive, not the manufacturer's actual cost, but the actual cost of manufacture." (At pages 556, 557.) Constructed value then takes in not only the cost of fabricating standard equipment but also the cost, albeit under connected contract, of any revisions fabricated in the equipment as imported.

In Fergus Imported Cars, Inc. v. United States, *supra*, wherein plaintiff challenged the allocation of certain costs under statutory cost of production, it was not disputed that an item listed as "Inspections stations labor" which, according to a report of a customs agent referred to inspection of materials used in the production of parts and accessories, and of *manufactured* parts and automobiles, including *running tests*, formed a part of cost of production. Plaintiff claimed, however, that it should be treated as a usual general expense rather than, as it had been charged in the appraisement, as part of the cost of materials and fabrication. Chief Judge Rao, holding that inspection of raw materials and of the finished products is an element entering into the manufacturing process, stated (52 Cust.Ct. at 443–444):

> Moreover, in view of the explanations in defendant's collective exhibit 1 concerning the item "inspection stations labor etc." as referring to "inspection of incoming materials used in the production, of incoming parts and accessories, of manufactured parts and automobiles, including running tests," it would appear that this element is so inextricably entwined into "the process employed in manufacturing * * * such * * * merchandise," as to constitute a production cost rather than an overhead expense.

The term "usual general expenses" was defined in United States v. Alfred Dunhill of London, Inc., 32 CCPA 187, C.A.D. 305, as follows:

> In our opinion the "usual general expenses" of a business are the expenses of doing business. This would include in addition to the cost and manipulation of materials, all salaries, wages and commissions, traveling expenses, advertising, rents, taxes on buildings, stationery, stenographic, telephone and telegraph expenses, costs of delivery, depreciation on plant and equipment, and other actual outlays. These are the usual general expenses of business, and profit is calculated on the difference between such expenses and receipts.

---

4. The trial judge also held that the costs should be prorated over the two models produced, notwithstanding that only one was imported.

Under a statutory formula which separates the cost of materials and of fabrication from the usual general expenses, a charge directly involved in the completion of the finished article is one more naturally attributable to unit cost than to general output. Inspection of raw materials, of intermediate processes, *and of the end product are procedures which contribute to the perfection of the commodity being manufactured.* It is a necessary incident to actual production and, in the opinion of this court, this cost is one which is incurred in the course of fabrication. There was no error in the appraiser's action in so considering it. [Emphasis supplied.]

I find that the testing costs herein are analogous to the challenged items in *Fergus* and *H. K. Ferguson, supra.* The testing was not merely a *sine qua non* of the contract; it was an essential part of the manufacturing process described therein. The agreement, which detailed the testing procedures and performance criteria, gave Goodrich-Gulf the right to notify Ruhrchemie whether or not it would accept the work after testing, and specified further that, "In the event of such nonacceptance, RUHRCHEMIE agrees to perform *such additional work as shall be necessary to complete the WORK* upon the approval of GOOD-RICH-GULF." [Emphasis supplied.] Moreover, the contract provides that "After such *reworking*, RUHRCHEMIE shall repeat the test * * *", [emphasis supplied] and that Goodrich-Gulf shall notify the manufacturer whether or not it will accept the work.

Clearly, it was within the contemplation of the parties that the manufacturing process was not to be completed until the equipment was tested, "reworked," [5] if necessary, and retested.

In light of the uncommon nature of the equipment contracted for, the provisions for testing were not so unusual as to be outside the pale of the statutory constructed value formula. The dryer systems were, as Blank stressed in his first affidavit, "non-standard items" which were of "unusual size" and "the largest of their type that Ruhrchemie had ever designed." Their performance capacity was unknown. Also, it does not appear, and the record does not indicate otherwise, that any other West German manufacturer had produced dryer apparatus of this type and size. Therefore, it is to be expected that the testing employed in connection with the manufacture of equipment made to exceptional specifications would require testing of a somewhat different order from that used in the fabrication of standard or stock articles. Thus, Blank's assertion that the testing program was "entirely different from the testing of equipment sold in ordinary transactions," is somewhat irrelevant in the face of a constructed value provision that includes the cost "of fabrication or other processing *of any kind* employed in producing *such or similar* merchandise." [Emphasis supplied.]

Accordingly, the testing costs were properly included by the appraising officer as elements of constructed value.

In support of its claim that, if includable, the testing costs should be reduced by the amount of the agreed salvage value, plaintiff cites English Electric Export & Trading Co. v. United States, 53 CCPA 84, C.A.D. 881 (1966), which involved the computation of "profit" under statutory cost of production. In that case, the court found, from the facts therein, that the "profit which ordinarily is added" was the profit actually added, and that the sum by which the contract price was reduced (as a penalty for failure of imported merchandise to meet certain contractual specifications) amounted to a reduction in the actual profit which should have been subtracted from the appraised value. Although the penalty sum was not determined until

---

5. With respect to reworking, the agent's report (exhibit A) reveals that certain items had to be replaced and that others required "minor but essential changes".

Such modifications and changes, discovered only after testing, patently were part of the cost of fabrication. The H. K. Ferguson Company v. United States, *supra.*

after the merchandise was imported and installed in the United States, the court stated:

> * * * The fact that the transaction involving the penalty occurred after exportation presents no difficulty since it did occur in time for evidence regarding it to be submitted to the Trial Court.

However, the computation of general expenses and profit under section 402(d)(2) differs from that employed in determining the cost of materials and of fabrication under section 402(d) (1) which requires that it be the cost "at a time *preceding the date of exportation of the merchandise undergoing appraisement* which would ordinarily permit the production of that particular merchandise in the ordinary course of business." [Emphasis supplied.]

Clearly, under subsection (1), the element of "cost of materials" is to be ascertained as of the time when such materials were or could have been purchased for the production of the particular merchandise under consideration. Charles Stockheimer Inter-Maritime Forwarding Co. et al. v. United States, 44 CCPA 92, C.A.D. 642 (1957); Oxford University Press, N. Y., Inc. v. United States, 36 CCPA 102, C.A.D. 405 (1949); Stockheimer & Harder, American Foreign Industries, Inc. v. United States, 58 Cust. Ct. 801, A.R.D. 218 (1967); Schweppes (U.S.A.), Ltd. v. United States, 43 Cust. Ct. 608, A.R.D. 111 (1959); F. X. Coughlin Co. v. United States, 58 Cust. Ct. 615, R.D. 11271 (1967); Swizzels, Inc. v. United States, 38 Cust. Ct. 644, R.D. 8794 (1957).

As I find that the testing constituted an integral part of the manufacturing process, and it is not disputed that the materials retained by Ruhrchemie were used in testing the equipment, the cost of these materials falls within the prescribed statutory time period. And it is irrelevant that, upon a later date, their so-called "salvage value" was deducted from the reimbursable testing costs. Schweppes (U.S.A.), Ltd. v. United States, *supra*; Swizzels, Inc. v. United States, *supra*. Nor may I inquire into the effects of any action taken by the manufacturer to reduce its initial costs. Schweppes (U.S.A.), Ltd. v. United States, *supra*. The purpose of the law is "to derive, not the manufacturer's actual cost, but the actual cost of manufacture." Ford Motor Company v. United States, *supra,* at page 556.[6]

By statute, 28 U.S.C. § 2633, a party attacking an appraised value has the burden of proving such value is incorrect and the asserted value is correct. As plaintiff has failed to establish error in the appraisement I do not pass upon the question, raised by defendant, whether it has satisfactorily established the claimed value of the disputed items.

I find as facts:

1. The involved merchandise consists of a special flight drying apparatus exported from West Germany on October 7, 1960.

2. The merchandise was appraised on the basis of constructed value, section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Neither party challenges this basis of appraisement.

3. The appraised constructed value included certain costs for testing performed in connection with and as a part of the manufacturing process.

I conclude as law:

1. Constructed value, as defined in section 402(d), Tariff Act of 1930, as amended *supra*, is the proper basis of appraisement herein.

2. Such value is the appraised value. Judgment will be entered accordingly.

---

6. And see Oxford University Press, N. Y., Inc. v. United States, *supra*, involving the appraisement on the basis of cost of production of 5000 unbound books in sheets. The court held that the nonrecurring costs of the plates from which the sheets were printed could be spread over only the 20,000 copies which had actually been printed prior to exportation and not over an additional 45,000 copies which allegedly were to be printed from the plates at some future date. All costs actually incurred prior to exportation were considered as part of the cost of materials.